MARY G. TIGHE v. CHARLES H. OSBORNE, Inspec-
TOR OF BUILDINGS.

*Police Power—Delegation by Municipality—Issue of Building*
*Permits—Invalid Ordinance.*

The police power is the power inherent in the state to pre-
scribe, within the limits of the federal and state constitutions,
reasonable regulations necessary to preserve the public order,
health, safety, or morals.                    p. 356

The words "general welfare," as used by the courts in defin-
ing the scope of the police power, are synonymous with and
referable to the specific objects enumerated in the above defini-
tion.                    pp. 356, 357

The police power cannot justify any act which violates the
prohibitions, express or implied, of the state or federal constitu-
tion.                    p. 357

An abridgment, under the police power, of the free use of
property, held under the protection of the constitution, can be
justified only when the exercise of the power is reasonably
referable to one of the specific objects of that power, the public
order, security, health, or morals.                    p. 358

If persons owning property in Baltimore City may be deprived
of the reasonable and beneficial use thereof by a zoning ordi-
nance of the city, the ordinance is invalid, and must fall, unless
such use imperils the public order, security, health, or morals.
                    pp. 358, 359

The power to decide whether a given use of property imperils·
the public order, security, health, or morals, so as to justify
depriving the owners of such use, is vested in the Legislature,
although the exercise of the power may be reviewed by the·
courts.                                                p. 359·

While the policy, wisdom, or expediency of legislation enacted
under the police power are for the Legislature to decide, whether·
the legislation is within the police power is for the courts to·
decide.                                                p. 359

The Legislature may delegate the right to exercise the police
power to municipalities.                               p. 359

A municipal corporation may delegate to subordinate officials·
the power and duty of carrying into effect valid ordinances·
adopted by it, and provide all the machinery necessary therefor,
even though such delegation involves the exercise of a certain
discretion by such officials which may be regarded as a part of·
the police power, if such discretion is guided and restrained by
rules and standards sufficient to protect the citizen against any
arbitrary or unreasonable exercise thereof.            p. 360·

The City of Baltimore cannot delegate to any other agency
the police powers, delegated to it by the Legislature, relating to·
any part of its governmental powers, although it may do its
ministerial work by agents, and must of necessity clothe them
with certain discretionary powers.                     p. 361

Ordinance 334 of Baltimore City, conferring upon zoning·
officials the right to refuse permits for the erection of any new
building or any change in the use of an existing building, struc-
ture or land, when the new building or use would, in their opin-
ion, create hazards from fire or disease, or menace the public·
welfare, security, health, or morals, and providing that in pass-
ing on applications for permits they may consider such matters·
and facts as in their judgment may be necessary to determine·
whether the new building or use will prejudice the public wel-
fare, is invalid as delegating to those officials an unlimited dis--.
cretion in determining what uses would conflict with the public
welfare.                                               pp. 361-368·

The provision of the ordinance that, in passing on applica--
tions, the officials shall consider the character and use of build-

.ings in the vicinity of the property mentioned in the application, and traffic conditions in that vicinity, does not supply proper standards for the guidance of the officials in refusing permits.                                                       pp. 362, 363

*Decided December 10th, 1925.*

Appeal from the Baltimore City Court (DUKE BOND, J.).

Mandamus proceeding by Mary G. Tighe against Charles H. Osborne, Inspector of Buildings for Baltimore City. From a judgment in favor of respondent, petitioner appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*C. Arthur Eby,* for the appellant.

*Philip B. Perlman, City Solicitor,* with whom were *Wirt A. Duvall, Jr., Deputy City Solicitor,* and *George E. Kieffner, Assistant City Solicitor,* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The appellant in this case, on May 25th, 1925, applied to Charles H. Osborne, Inspector of Buildings of Baltimore City, for a permit to erect, on Cokesbury Avenue, in that city, a two-story brick building, to be used as a stable for thirty horses and to be constructed in accordance with plans and specifications filed as part of the application, which conformed fully with the requirements of the building code of Baltimore City. The Inspector of Buildings of Baltimore City however refused to issue the permit, or to accept the application, for the reason that the applicant had not also complied with the requirements of Ordinance No. 334 of the Mayor and City Council of Baltimore. The applicant, contending that Ordinance No. 334 was unconstitutional and void, thereupon filed in the Baltimore City Court a petition

setting out these facts, and praying that court to issue a writ
of mandamus directing the inspector of buildings to accept
her application and to issue to her a permit to erect the
stable. The respondent, the appellee here, answering, ad-
mitted the averments of the petition, except those which
challenged the validity of the ordinance, and further answer-
ing said: "That the lot upon which the applicant proposes
to erect a stable is situated in a block occupied exclusively
for residential purposes, with the exception of the lot at the
southeast corner of Cokesbury and Montebello Avenues,
which said lot is improved by a church, said building being
approximately one hundred feet from the property of the ap-
plicant; that property immediately in the rear of the site of
the proposed stable is improved by frame dwelling houses,
being separated from the property of the applicant only by
a three-foot alley; that the establishment of a stable at this
location would constitute a public nuisance for the reasons,
that the danger from fire would be greatly increased by the
storage of hay, straw and feed on the premises; that the resi-
dents of the neighborhood would be greatly disturbed in the
peaceful enjoyment of their property by the emanation of
disagreeable and unhealthy odors; and that the public health
would be greatly endangered by the attraction of large num-
ber of vermin and insects to the location; that Ordinance
No. 334 imposes the duty on the defendant to make an in-
vestigation of the proposed use and to refuse the permit if
the public health, welfare or safety would be endangered;
that this ordinance is valid and constitutional, and that the
applicant is required to conform to the provisions, to wit:
the advertising and posting and the submission to a decision
by the defendant as to whether or not the permit shall be
issued; that except for Ordinance No. 334 the defendant is
without authority to require the petitioner to submit the ap-
plication for his decision, after investigation, or for the de-
cision of any other municipal officer." A demurrer to that
answer was overruled, and upon the petitioner's refusal to

reply further, the writ was refused, the petition dismissed, and judgment entered in favor of the defendant for costs.

From that decision this appeal, which requires this Court to determine the validity of the ordinance in question, was taken.

The purpose of the ordinance, as indicated in its title, is to regulate the use as distinguished from the construction of all buildings in Baltimore City, except those proposed to be used for residential purposes, and its scope is defined in the first section thereof which provides that:

"(a) No building or structure of any kind, intended or designed to be used for any purpose which, because of its particular location and/or the use to which such building or structure is intended to be put, would create hazards from fire or disease, or would in any way menace the public welfare, security, health or morals, shall be erected in the City of Baltimore.

"(b) No existing use of any land, building or structure shall be changed to a use which, because of the particular location of such land, building or structure, and/or the nature of the proposed use, would create hazards from fire or disease, or would in any way menace the public welfare, security, health or morals."

Section 2 provides in part:

"That no building or structure shall be erected, nor shall the existing use of land, buildings or structures in the City of Baltimore be changed, unless the owner thereof, or his duly authorized agent, shall first obtain from the Zoning Commissioner a permit authorizing the erection of such building or structure and such use, or authorizing such change of use. * * *

"The Zoning Commissioner shall grant permits applied for under the provisions of this ordinance unless, in his judgment after investigation, the proposed buildings or structures, use, or changes of use would create hazards from fire or disease, or would in any way menace the public welfare, security, health, or morals. * * * In case an application is refused, the

Zoning Commissioner shall notify the applicant in writing. Any person aggrieved by any decision, determination or order of the Zoning Commissioner may appeal within five (5) days to the Board of Zoning Appeals. * * *

"The Board of Zoning Appeals shall hear and decide appeals from any decision, determination or order made by the Zoning Commissioner. * * * The Board of Zoning Appeals shall not refuse any application involved in an appeal before it, unless, in the judgment of a majority of the members of said board, it appears from satisfactory evidence that the proposed building or structure or use or change of use would create hazards from fire or disease, or would in any way menace the public welfare, security, health, or morals. * * *

"Any person or persons in interest may contest the legality of any order, decision or determination of the Board of Zoning Appeals within ten (10) days after the date of said order, decision or determination by filing an appeal therefrom by petition to the Baltimore City Court, praying said court to review the same. * * * The jurisdiction of the Baltimore City Court on appeal shall be limited to the question of the legality of the order, decision or determination complained of."

Section 3 provides:

"That in passing upon applications, the Zoning Commissioner and the Board of Zoning Appeals shall give consideration to:

"(a) The character and use of buildings and structures adjoining or in the vicinity of the property mentioned in the application.

"(b) The number of persons residing, studying, working in or otherwise occupying buildings adjoining or in the vicinity of the property mentioned in the application.

"(c) The location, kind and size of surface and subsurface structures in the vicinity of the property men-

tioned in the application, such as water mains, sewers and other utilities.

"(d) Traffic conditions.

"(e) Such other matters and facts as may, in the judgment of the Zoning Commissioner or the Board of Zoning Appeals, be necessary to determine whether the proposed building or structure or use or change of use would be prejudicial to the public welfare, or adversely affect the public safety, security, health, or morals."

Section 4 designates the officials authorized to administer the law. Section 5 directs that the ordinance is in addition to and not "in substitution for" existing ordinances. Section 6 makes it apply to all uncompleted structures. Section 7 excepts from its operation property "proposed to be used for residential purposes exclusively, or proposed to be used for a purpose or purposes customarily incident to residential use; provided such proposed incidental or accessory use would not create hazards from fire or disease, or would not in any way menace the public welfare, security, health or morals." And section 8 provides penalties for violations.

The contention of the appellant in effect is that this ordinance confers upon the Zoning Commissioner and the Board of Zoning Appeals the entire police power of the State with respect to the use of all real property in the city of Baltimore, and commits to their discretion, without adequate restraints, limitations or standards, the power to deprive persons owning real property in that city of the beneficial use thereof without compensation, even where such use in nowise menaces or affects the public order, health, safety or morals.

The city on the other hand contends that it has no such effect, but that it is a proper and constitutional delegation to its agents of the administrative power necessary to accomplish the purpose of the ordinance, which purpose is to protect the public welfare, health, security and morals in Baltimore City.

From that statement of the case it appears that the ques-

tions with which we are to deal are, first, Does the ordinance derogate from the rights, privileges and immunities guaranteed to the individual by the state or federal constitutions, and, if it does, is that action a legitimate exercise of the police power of the State?

In its broadest sense the police power is said to be the power of government inherent in every sovereignty. *Bouvier's L. Dict.* (Rawle's Revision) 2615. In the nature of things its precise boundaries are difficult if not impossible to define, but as government exists for the preservation of the general welfare of society (Preamble, Federal Constitution), its legitimate exercise must bear some actual and definite relation to that object. The power, although not by that name, has been invoked for many centuries in England to justify sanitary and sumptuary legislation, and legislation punishing heresy, interfering with the worship of particular sects, regulating occupations, restraining speculation, monopolies and the like (Rawle's Revision, Bouvier's L. Dict.), but as commonly and currently understood, the doctrine of the police power is of comparatively recent origin, although within the last century it has been considered and applied by the courts of this country in cases infinite in number and in the variety of their facts. While that mass of litigation has resulted in no single comprehensive definition of the power, so far as it is applicable to cases like this one, which has been universally accepted, by the weight of authority it has been given a meaning narrower than that first stated, which is we think fairly expressed by the following formula, which is that the police power is the power inherent in the state to prescribe, within the limits of the federal and state constitutions, reasonable regulations necessary to preserve the public order, health, safety, or morals. 12 *C. J.* 904, and cases cited. In many of the cases in which the nature and extent of the police power have been considered, the words "general welfare" have been added to that definition, and there has been a tendency in some courts to treat that expression as enlarging the scope of the police power so as to

reach an infinite variety of objects which could not be re-
ferred to any one of the objects definitely specified in the
definition we have given.  But in our opinion the words
"general welfare," as used by this Court and other courts in
defining the scope of the police power, do not have that effect,
but are synonymous with and referable to the specific objects
enumerated in the definition given above.

But the police power, even as thus defined, vague and vast
as it is, has its limitations, and it cannot justify any act
which violates the prohibitions, express or implied, of the
state or federal constitutions.  *Byrne v. Md. Realty Com.,*
129 Md. 210; *Goldman v. Crowther,* 147 Md. 293.  If this
were not so, and if the police power were superior to the con-
stitution and if it extended to all objects which could be em-
braced within the meaning of the words "general welfare,"
as defined by the lexicographers, the constitutions would be
so much waste paper, because no right of the individual
would be beyond its reach, and every property right and
personal privilege and immunity of the citizen could be in-
vaded at the will of the state, whenever in its judgment the
convenience, prosperity, or mental or physical comfort of the
public required.

And so where an act of the Legislature is in obvious and
plain conflict with the constitution, it cannot be validated by
invoking the police power, for, as Chief Justice Marshall
observed in *Brown v. Maryland,* 12 Wheat. 449, in speaking
of a conflict between the powers remaining in the states and
those vested in the federal congress, "that which is not su-
preme must yield to that which is supreme."  But as the
police power rests in part at least on the maxim *sic utere tuo,
ut alienum non laedas,* and as a constitution ordinarily
neither creates nor protects the right of one to so act or use
his property as to injure his neighbor, it cannot be invoked
to prevent the exercise of the police power when exercised
in the public interest to prevent such act or use, and that
general principle is, we think, very clearly expressed in
*Commonwealth v. Alger,* 7 Cush. 84, where it is said: "We

think it is a settled principle, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated, that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community." But wherever the free use of property held under the protection of the constitution is abridged under the ostensible authority of the police power, the invasion cannot be justified unless the exercise of the power is reasonably referable to one of the specific objects of that power, the public order, security, health, or morals.

The Constitution of Maryland contains these provisions:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the law of the land." Article 23, Bill of Rights.

* * * "The General Assembly shall enact no law authorizing private property to be taken for public use, without just compensation as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation." Article 4, section 40, Const. of Md.

And the first question raised by the appeal is whether Ordinance No. 334 violates any of them.

In *Goldman v. Crowther, supra,* it was held: "And while every one holds his property subject to the implied condition that his use of it shall not injure others with equal rights, so long as his use of it does not interfere with or injuriously affect the public health, morals or safety, he will be protected in his use and ownership of it against the state or any agency or department thereof." If, therefore, persons owning property in Baltimore City may be deprived of the reasonable and beneficial use thereof by the ordinance, it is in-

valid, and must fall, unless such use imperils the public order, security, health, or morals.

The power to decide whether a given use does have such an effect is vested in the Legislature, although its exercise of that power may be reviewed by the courts. That is to say, that while the policy, wisdom or expediency of legislation enacted under the police power are for the Legislature to decide, whether the legislation is within the police power is for the court to decide.   12 *C. J.,* Constitutional Law, par. 443.

It is also settled that the Legislature may delegate the right to exercise the police power to municipalities.   *Rossberg v. State,* 111 Md. 411.   But it is not so clear that the municipality can redelegate the power thus conferred upon it to another.   In 28 *Cyc.* 276, the general rule is thus stated: "Since all governmental power is held in trust by the state for the benefit of the public, it has been generally denied that such power can be delegated by the state to anybody.   But repeated adjudication has settled that the maxim *potestas delegata non est deleganda* does not preclude the Legislature from conferring sovereign powers on municipalities in such measure as to it seems wise and proper.   More important and difficult is it now to ascertain whether the governing body of the municipality may delegate its powers to another; and if so which powers, and to what extent delegation may be made by the council.   It has repeatedly been held that the municipality had no such power of delegation. But it is now the recognized rule that the state may expressly authorize delegation of certain powers by the corporation. In the absence of such express authority the council must itself exercise all discretionary powers; but this does not forbid the delegation of ministerial or administrative functions to subordinate officials."   That rule in substance was the same as that stated by this Court in *Mayor etc. v. Scharf,* 54 Md. 499, and while the conclusion in that case was reversed in *Mayor etc. v. Hopkins,* 56 Md. 1, so much of the opinion as deals with that principle was not discussed in the

latter case. But the last cited case was overruled in *Ulman
v. Baltimore,* 82 Md. 587, and the opinion of Judge Irving
in the *Scharf* case referred to with approval in that case,
and in the case of *Baltimore v. Gahan,* 104 Md. 151, where
through Judge McSherry the Court said: "Conceding, as
falling within the principle laid down in these cases, and as
intimated in *Mayor v. Stewart,* 92 Md. 551, that the power
to determine what material is to be used in paving a street,
is a legislative power, and that it is included under the power
to grade and pave, and is to be exercised by the city council,
unless validly reposed in some other agency; then that power
cannot be transferred by the city council to any one else."

Nor do we understand that the cases of *Rossberg v. State,*
111 Md. 411, and *Brown v. Stubbs,* 128 Md. 132, are at all
in conflict with the rule as there stated, because in those
cases the question was not whether the city could delegate
the police power to another, but whether it had the right it-
self to exercise it. The mere statement that the Mayor and
City Council could by ordinance delegate to subordinate
officials the entire police power conferred by the State upon
it, as well as its right to legislate, carries its own refutation.
12 *C. J.* 964. That it may delegate to such officials the
power and the duty of carrying into effect valid ordinances
adopted by it, and provide all the machinery necessary there-
for, has long been settled, even though such a delegation in-
volves the exercise of a certain discretion which may be re-
garded as a part of the police power by such officials in the
administration of their duties, where such discretion is guid-
ed and restrained by rules and standards sufficient to pro-
tect the citizen against any arbitrary or unreasonable exer-
cise thereof. *Baltimore v. Gahan,* 104 Md. 154. The city
is not the original depository of the police power, but it re-
ceived it from the Legislature and in respect to it is only a
delegate, and the idea that the Mayor and City Council of
Baltimore stands in the place of and has all the power that
the Legislature could exercise in Baltimore City is negatived
by section 2, article 11-A, of the Constitution of Maryland,

which provides: "Such express powers granted to the counties and the powers heretofore granted to the city of Baltimore, as set forth in article 4, section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this article, but such powers may be extended, modified, amended or repealed by the General Assembly." And an examination of that charter fails to disclose a provision which could be construed as authorizing it to delegate or transfer all of the legislative or police powers thus delegated to it relating to any part of its governmental powers to any other agency, and in our opinion it has no such right. For while it may do its ministerial work by agents, and must of necessity clothe them with certain discretionary powers, it cannot divest itself of the trusts, powers and duties imposed upon it by law, by surrendering them entirely to others. *Baltimore City v. Gahan, supra;* 12 *C. J.* 864.

In the light of these general principles we will turn to the provisions of the ordinance, to ascertain just what its effect is, and in that inquiry we will disregard so much of it as relates to an appeal to the Baltimore City Court, for even if that provision is valid, which we do not decide, it adds nothing to, and takes nothing from, the ordinance, which could affect its constitutionality.

The ordinance applies to every building and structure now existing or which may hereafter be constructed and all land in Baltimore City which is used or proposed to be used for any other than residential purposes.

It confers, first upon the Zoning Commissioner, and then upon the Board of Zoning Appeals, the right to prevent the erection of any new building or any change in the use of an existing building, structure or land in the city of Baltimore, where such new building is to be used, or such old use to be changed, to a use which in the opinion of these officials would create hazards "from fire or disease, or would in any way menace the public welfare, security, health or morals." And in passing upon that question those officials are required to

give consideration to the facts and circumstances enumerated in section 3 of the ordinance, which we have quoted above. These provisions are supposed to supply adequate rules, regulations and standards to define guide and limit the powers given the zoning officials by section 2 of the ordinance to insure uniformity and certainty in the administration of the law. But in our opinion they have the contrary effect. For while the protection of the public against the hazards of fire or disease and against anything which could menace the public health, morals or security may be regarded as equivalent to the "public welfare," that phrase could include matters which would have no tangible or physical relation to those specific objects, and there is nothing in the ordinance to prevent the zoning officials from giving it that broader meaning. If it is given that broader meaning, then it is indeed difficult to define the boundaries of the power granted to those officials, or to say with conviction what it could not be extended to embrace, for not only might their conception of what the public welfare demanded lead to one conclusion today and another tomorrow, but the interpretation of the phrase might also vary with the changing personnel of the officials administering the law. So that the use of all property would depend not upon certain and definite laws uniform in their application, but upon the arbitrary and changing views of individuals. And whilst it was within the power of the Mayor and City Council to protect the public welfare by adopting legislation forbidding uses which would conflict with it, it was not within its power to delegate to an official or a board the power to do that. But doubtful and obscure as that phrase is, as used in section 2, it is made more so by the language of section 3. By subsection (a) of that section the zoning officials in passing upon applications are required to consider the character and use of buildings in the vicinity of the property mentioned in the application. In connection with fire hazards, the public security, health, or morals, such considerations would be legitimate and proper, but in connection with what the official might consider the public wel-

fare, they could also induce them to refuse a permit for a use which, while not affecting the public order, security, health or morals, would tend to lower property values in the neighborhood, or for a building which did not conform to the architectural design of other buildings in the vicinity, which would not be valid reasons for refusing it. *Goldman v. Crowther, supra.* The same comment is also applicable to sub-sections (b) and (c). By sub-section (d) the zoning officials are also required to consider traffic conditions in the vicinity of the property mentioned in the application. That consideration might have a perfectly proper and legitimate relation to the recognized objects of the police power, but it might also, when used in connection with the phrase "public welfare," be used to justify the refusal of a permit on grounds which would have no legitimate relation to those objects. As for instance, they might consider that the erection of a large office building or an apartment house in a residential suburban district would inconvenience and annoy that part of the public residing in the neighborhood by increasing the traffic on the adjacent highways.

Sub-section (e) provides: That the zoning officials are also to consider "such other matters and facts as may, in the judgment of the Zoning Commissioner or the Board of Zoning Appeals, be necessary to determine whether the proposed building or structure or use or change of use would be prejudicial to the public welfare, or adversely affect the public safety, security, health or morals." By that section, after giving consideration to the matters specified in the four preceding sections, the zoning officials are in effect authorized to refuse an application for any matter or fact which in their "judgment," connected with the use, change of use, structure, or building, would be "prejudicial to the public welfare."

It is not easy to frame a broader, more comprehensive, more indefinite, or more unrestricted grant or power than that. Under it, in order to justify the zoning officials in refusing to grant an application, it is not necessary that the

proposed use shall in fact be prejudicial to the "public welfare," whatever that may mean, but it is sufficient if in their judgment it will have that effect. Because in passing upon the application they must consider "such other matters and facts" as in their "judgment" may be necessary to determine whether the proposed structure, use, or change of use, would be prejudicial to the public welfare. And as they are authorized to consider such matters and facts, they must also be permitted to be influenced by them, for there could be no other reason for their consideration.

Such a grant of power is in our opinion arbitrary and in conflict with both of the constitutional guaranties referred to above, because it commits to the arbitrary discretion of subordinate officials the power of depriving the citizen · of his property without compensation by taking from him the beneficial use thereof, regardless of whether such deprivation is required for the protection of the public order, security, health or morals. This conclusion is necessary unless we are to disregard entirely those settled principles of law which are thus stated in *Tiedeman on The Police Power,* 122a:

"* * * The Legislature cannot prohibit a use of lands, which works no hurt or annoyance to the neighbors or adjoining property. The injurious effect of the use of the land furnishes the justification for the interference of the Legislature. The legislative prohibition or regulation of the use and enjoyment of one's private property in land is in violation of constitutional principles, which is not confined to the prevention of a nuisance. A certain use of lands, harmless in itself, does not become a nuisance, because the Legislature has declared it to be so. The Legislature can determine whether it will permit or prohibit the doing of a thing which is harmful to others, in the proper consideration of the public welfare; but it cannot prohibit as a nuisance an act which inflicts no injury upon the health or property of others. If the harmful or innocent character of the prohibited use of lands furnishes the test for determining the constitutionality of the legislative prohibition, it is

clearly a judicial question, and is certainly not within the
legislative discretion, whether the prohibited act or acts work
an injury to others. If they do not cause injury or annoy-
ance to others, the attempted legislative interference is un-
warranted by the constitution, and it is the duty of the courts
to declare it to be unconstitutional."

These conclusions are in accord with the prior decisions
of this Court, and while, in view of the fact that many of
those decisions were cited and reviewed in the recent case of
*Goldman v. Crowther, supra,* it is unnecessary to again refer
to all of them, we deem it proper to refer to such of them as
are immediately pertinent to the issue now before us.

The appellee relies mainly upon the cases of *Easton v.
Covey,* 74 Md. 262, and *Farmers & Planters Co. v. Salis-
bury,* 136 Md. 617. Both of these cases differ from this in
that in each of them the ordinance under consideration com-
mitted the power to grant building permits to the discretion
of the very body which passed the ordinance, and to which
the Legislature had directly delegated the police power of
the State as well as the power to pass such ordinances as
were in their judgment necessary for the health, peace, and
safety of the inhabitants of their respective cities, and in
each of those cases the ordinance was designed to regulate
and not to prohibit the construction of buildings. But aside
from those considerations, the ordinances in each of those
cases were mere building ordinances, and were obviously de-
signed to protect the public against the dangers which might
result from the construction of flimsy and unsafe structures
built of inflammable material, and the duties imposed by
them were essentially ministerial in character. In the *Covey*
case, *supra,* the ordinance under consideration made it un-
lawful for any person to erect certain specified buildings
within the town limits without first having obtained a per-
mit from the commissioners. Such an enactment was ob-
viously valid either as a reasonable provision for the registry
of new buildings for the purpose of taxation, or to enable the
city officials to ascertain in advance of their construction

whether the proposed structures would affect the public
health or safety. It is true that in that case the Court used
language which if literally construed could support the ap-
pellee's contention. But an examination of the case itself
as well as the cases preceding and following it indicates that
it could not have been so intended. If, however, it could be
taken to mean that the right to grant or withhold permits
could be validly committed to the arbitrary discretion of the
commissioners, without any substantial relation between their
exercise of that discretion and the public security, health,
morals, or physical comfort, then we should be compelled to
disregard it, first because it was unnecessary to the decision,
and second, because it would have been in conflict with the
decisions of this Court as well as the weight of authority
elsewhere. But it was not in our opinion intended to have
that effect. It was dealing with an ordinance clearly valid,
and the precise question before it was not the validity of the
ordinance, for that was conceded by the pleadings, but
whether the commissioners acting under it had properly re-
fused to grant the permit. We say that, because Covey ap-
plied for a mandamus to compel the commissioners to issue
a permit to him, which they could only have done under the
ordinance, and if the ordinance was void manifestly they
could not have issued the permit. Their defense was that
they had a discretion to grant or refuse a permit in a given
case and their exercise of the discretion in that case did have
an apparent connection with the protection of the public
security.

The court in that case referred to the *Radecke* case, 49
Md. 228, and distinguished it on the ground that it com-
mitted to the Mayor of Baltimore City "the unrestrained and
absolute power at his own mere will and pleasure to revoke
any and every permit" for the use of steam boilers in Bal-
timore City, but that power could scarcely have been more
unrestrained or absolute than the power to prevent the erec-
tion of any new building which the commissioners thought
would, by reason of its location, or the character of the busi-

ness to be carried on in it, be detrimental to the town, and for that reason Judge Miller, who also wrote the opinion in the *Radecke* case, must have intended to have had the statement we have quoted read in connection with the rule that the exercise of such a discretion as he described can only be justified when used in connection with some legitimate object of the police power.

In the case of *Bostock v. Sams,* 95 Md. 401, the Court had before it an ordinance relating to the issuance of permits by the Appeal Tax Court of Baltimore, which contained a provision "that no such permit shall be granted unless in the judgment of the said judges of the appeal tax court, or a majority of them, the size, general character and appearance of the building or buildings to be erected, will conform to the general character of the buildings previously erected in the same locality, and will not in any way tend to depreciate the value of surrounding improved or unimproved property." Dealing with the effect of that grant of power it said:

"Now undoubtedly the proviso in the ordinance here under consideration attempts to confer powers that affect the citizen in his right of property and his common law right. It cannot be pretended that the citizen has not the common law right to acquire title to a lot of land, qualified or absolute, in a city as elsewhere and to build upon, and improve it as his taste, his convenience or his interest may suggest, or as his means may justify without taking into consideration whether his buildings and improvements will conform in 'size, general character and appearance' to the 'general character of the buildings previously erected in the same locality'; even though there might be those in whose 'judgment' his so building might in some way 'tend to depreciate the value of surrounding improved or unimproved property.' * * * A right to create power so vague and undefined in its scope, so entirely unrestricted in its exercise, and so essentially arbitrary in its character, designed to abridge important and valuable property rights of the citizen, if it can be conferred at all upon a municipal corporation, ought to be

found to be so conferred in very clear terms or by some necessary implication.

"Nowhere in the charter of the city of Baltimore can it be found that there is conferred upon the corporation, by any express legislative provision, the power implied in the ordinance under consideration. Nor can such power be deduced by any reasonable implication from any of the specific or general powers enumerated and granted in the charter."

In the *Salisbury* case, *supra,* the court cited *Bostock v. Sams,* and relied upon the decision in the *Covey* case, but not upon the language to which we have referred. There, the ordinance, also a building ordinance, contained precise and definite rules and standards to guide and limit the acts of the officials charged with its administration, and in that case this Court, through Judge Stockbridge, said: "It is of course true that an ordinance cannot confer an unlimited discretion, but must be limited to cases which have been provided for and the manner prescribed by certain general and fixed rules. It was exactly this which the ordinance in question gives, specifying the various matters to be taken into consideration in the exercise of that discretion."

Without further prolonging this opinion, it is sufficient to say that in our judgment Ordinance No. 334 of the Mayor and City Council of Baltimore is invalid, because it improperly delegates to the Zoning Commissioner and the Board of Zoning Appeals of Baltimore City arbitrary, undefined, and unreasonable powers, under which persons owning real property in that city can be deprived of the entire beneficial use thereof without compensation.

It follows therefore that the decision appealed from will be reversed and the case remanded for further proceedings.

*Judgment reversed and case remanded for further proceedings, the appellee to pay the* **costs.**

URNER, J., filed the following dissenting opinion, in which BOND, C. J., and PATTISON, J., concurred:

Ordinance No. 334 of the Mayor and City Council of Baltimore is in my opinion a valid enactment. It indicates no purpose to extend its operation beyond the proper limits of the police power which the State has authorized the city to enforce. Adequate protection of individual rights is afforded by provisions for administrative investigation and review of the facts and merits of each case to which the ordinance may apply, and for a judicial determination as to the legality of any action by which an interested person may be aggrieved. I see no justification in the record for the appellant's refusal to submit her application for a building permit to the processes of inquiry and decision which the ordinance prescribes.

Under its charter the City of Baltimore is entitled to exercise the police power of the State within the limits of the municipality. *Charter of Baltimore,* art. 1, sec. 18; *Rossberg v. State,* 111 Md. 394; *Osborne v. Grauel,* 136 Md. 88. It was the evident purpose of Ordinance No. 334 to apply that power to the regulation of the use of buildings thereafter proposed to be constructed or to be converted to purposes different from those for which they were previously utilized. In providing that the permits applied for should be granted unless the intended use would "create hazards from fire or disease," or "menace the public welfare, security, health or morals," the ordinance used terms which have been employed by this Court to define the limitations of the police power. *Goldman v. Crowther,* 147 Md. 282; *Byrne v. Maryland Realty Co.,* 129 Md. 210; *Brown v. Stubbs,* 128 Md. 129; *Stubbs v. Scott,* 127 Md. 86; *Cochran v. Preston,* 108 Md. 220; *Bostock v. Sams,* 95 Md. 400.

It should be presumed that the ordinance used the words "public welfare" in a sense consistent with their use in the cases just cited, all of which were decided before the ordinance was passed. It would hardly be feasible to specify in an ordinance all of the conditions which would justify the

refusal of building and use permits in the interest of the public health, morals, safety and welfare, or to dispose by special ordinance of each application as it is presented. Building operations in the city, and the municipal business, would be seriously inconvenienced if such questions had to· be determined, a's they currently arise, by the legislative· action of the city council. It was necessary and permissible that the duty of ascertaining the facts, and of granting or· refusing permits as circumstances require, should be committed to municipal officers under general directions as to· the purpose and scope of their discretion. There are numerous decisions which recognize the validity of such delegations· of administrative authority. Some of the decisions having· that effect were rendered in *Mahler v. Eby,* 264 U. S. 32, 40; *Mutual Film Corporation v. Ohio Industrial Com.,* 236 U. S.. 230; *Union Bridge Co. v. United States,* 204 U. S. 387; *United States v. Grimaud,* 220 U. S. 506; *Philadelphia Co.. v. Stimson,* 223 U. S. 605; *Goldman v. Crowther, supra;·* *Smith v. Standard Oil Co.,* 149 Md. 61; *Osborne v. Grauel, supra; Creaghan v. Baltimore,* 132 Md. 442; *State v. Hyman,. 98 Md. 596; State v. Broadbelt,* 89 Md. 565; *Deems v. Baltimore,* 80 Md. 164; *Boehm v. Baltimore,* 61 Md. 259.

The discretion which the Zoning Commissioner may exer-· cise under the ordinance is not unlimited. Some of the· considerations which must influence his judgment are specifically stated, and he is charged with the duty of investigating· all conditions which may aid him in determining whether· the public health, safety, morals or welfare would be prejudiced by the building construction or use for which a' permit· is requested. This is a question of fact which the city is· entitled to have determined before the permit is granted. If the intended use of the applicant's property is found to be inimical to some public interest which the police power should protect, the Zoning Commissioner is not authorized to grant· a permit, and if the public welfare, health, morals or safety would not be injuriously affected, the permit could not prop-- erly be refused. It is the purpose of the ordinance that the

commissioner's duty shall be intelligently and impartially performed. The violation of his duty should not be anticipated and assumed as a ground upon which to declare the ordinance invalid.

Upon appeal from a decision of the Zoning Commissioner, any error of judgment which he may have committed can be corrected by the Board of Zoning Appeals, and if the legality of its action is doubted, that question can be presented for judicial determination in the Baltimore City Court. The provision for an appeal to that court conforms to the decision in *Goldman v. Crowther, supra.* The considerations which must govern the action of the Board of Zoning Appeals, as provided by the ordinance, are the same as those by which the Zoning Commissioner's decision is to be controlled. If he acts upon an erroneous conception of the police power, by refusing a permit solely because of conditions to which that power has no legitimate relation, and if the Board of Zoning Appeals confirms such an error, the illegality of the order can be demonstrated and determined in the Baltimore City Court on the further appeal which the ordinance allows. The question to be decided on the appeal to that tribunal is whether the order appealed from was passed in violation of any principle or rule of law or procedure, with consequent injury to the appellant's rights. If an order is contested as illegal upon the ground that it transgresses the lawful limits of the police power, it is the function of the court designated in the ordinance to consider and decide whether the conditions proved in the case are such as to admit of a legal inference that the property use for which a permit is sought would tend to menace the public health, safety or morals, or any other public interest to which the police power may be constitutionally applied.

The fact that the ordinance omits to provide for an appeal to this Court does not impair its validity. The Baltimore City Court is possessed of competent jurisdiction to decide the appealable questions of legality in cases arising under the ordinance, and there is no constitutional ground of objec-

tion that its decision would be final so far as the jurisdiction of the state courts is concerned. In proceedings for the acquisition of private property under the power of eminent domain there are frequently questions of constitutional right to be determined by the courts to which the inquisitions are returned, but where no appeal from their orders in such cases is provided by statute, the finality of their action, as to any question within the scope of their jurisdiction, has been uniformly recognized by this Court. *New York Mining Co. v. Midland Co.,* 99 Md. 506; *Hopkins v. P. W. & B. R. Co.,* 94 Md. 263; *Moores v. Bel Air Water and Light Co.,* 79 Md. 391; *Francis v. Weaver,* 76 Md. 457; *Greenland v. County Commissioners,* 68 Md. 59.

The validity of the ordinance in question is supported by the decisions in *Easton v. Covey,* 74 Md. 262, and *Farmers and Planters Co. v. Salisbury,* 136 Md. 617. In the first of those cases the ordinance there in dispute prohibited the erection of any dwelling house, barn, shed, stable, storehouse, warehouse or shop, within the limits of Easton, without a permit obtained from the commissioners of the town through their clerk. An application for a permit to erect a frame stable having been refused by the commissioners, the applicant sued for a writ of mandamus to require that the permit be issued. The order of the circuit court granting the mandamus was reversed on appeal, and the ordinance was held to be a valid exercise of the police power conferred upon the municipality by its charter. In the second of the cases last cited, an ordinance of Salisbury, passed in pursuance of its charter police power, provided that no building within the corporate limits of the town should be erected or repaired without a permit from the mayor and council, and that the application for the permit should state the proposed location of the building, its size, and the materials of which it was to be constructed, and the purpose for which it was to be used. Upon the refusal of an application for a permit to erect an addition to a building to be used for storing, mixing and bagging fertilizers, a bill was filed for an injunction to

compel the issuance of the permit and prevent the town from interfering with the erection of the building while the suit was pending. A decree dismissing the bill was affirmed on appeal, and the ordinance was sustained as a constitutional exercise of municipal power.

In *Goldman v. Crowther* and *Bostock v. Sams, supra*, the ordinances were directed to specific purposes which were held to be unconstitutional. The case of *Stubbs v. Scott, supra*, was concerned with a particular administrative decision under a building ordinance. In *Hagerstown v. Baltimore and Ohio R. Co.*, 107 Md. 178, and *Baltimore v. Radecke*, 49 Md. 230, ordinances were held invalid on the ground that they conferred arbitrary and unrestricted discretion upon the municipal authorities. But the ordinance involved in this case restricts the discretion of the officials by whom it is to be administered, and confines its operation within constitutional limits, by providing that permits for the construction or altered use of buildings shall not be refused except for specified reasons within the purview of the police power as judicially defined. The provisions of the ordinance give me the impression that it was written in a studious effort to apply only such principles as this Court has approved. It is more explicit than the Easton and Salisbury ordinances in its description of the conditions with reference to which the issuance or refusal of building and use permits should be determined. The duty of acting upon applications for permits under those ordinances was committed to the members of the governing bodies of the municipalities, while the Baltimore ordinance provides for its execution by an administrative officer. But provision is made for the review of his decisions by a municipal board of appeal and by a court of justice. The right of the city to commit the duty of administering the ordinance to one of its officials is undeniable, in view of authorities already cited, and the provisions in the ordinance to that end do not distinguish this case in principle from the cases in which the police powers of Easton and Salisbury, as exerted for the protection of the welfare of those communi-

ties, by the regulation of building construction and uses, were under consideration. The ordinance now before us cannot, in my judgment, be invalidated consistently with those decisions, and I am unwilling to join in overruling them or modifying their effect. The opinion in the Easton case was delivered by Judge Miller, with the concurrence of Chief Judge Alvey and Judges Robinson, Irving, Bryan, Fowler, McSherry and Briscoe. It may be safely assumed that there was no lack of concern on the part of those judges for the constitutional rights of the citizen, whose desire to erect a stable in Easton they were unable to gratify. Their decision was followed unanimously and without qualification by their successors in the comparatively recent Salisbury case. The principle upon which the Court sustained the Easton and Salisbury ordinances should be equally available for the promotion of the public welfare of the City of Baltimore. I am unable to agree with the majority conclusion, because I think it places too strict a limitation upon the right of the city to regulate its development for the general benefit of its rapidly increasing population.