ELECTRIC PUBLIC UTILITIES COMPANY *v.*
PUBLIC SERVICE COMMISSION.
[No. 99, October Term, 1927.]

*Decided February 15th, 1928.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, and Sloan, JJ.

*Clarence W. Miles* and *George M. Brady,* with whom were *Miles & Edgett, Maloy, Brady & Yost,* and *Chapman & Cutler,* on the brief, for the appellant.

*Raymond S. Williams,* for the Public Service Commission.

Adkins, J., delivered the opinion of the Court.

This appeal is from a decree of Circuit Court No. 2 of Baltimore City, approving an order of the Public Service Commission refusing to grant permission to the appellant, the Electric Public Utilities Company, to purchase the capi-

tal stocks of the Home Electric Light Company of Lona-coning, the Emmittsburg Electric Company, the Antietam Electric Light & Power Company, and the Midland Electric Light Company, four Maryland corporations, and to pledge said stocks, together with other stocks owned by applicants, under a trust agreement between the applicant and the Guaranty Trust Company of New York, to secure $4,000,-000 of collateral gold bonds to be issued thereunder.

The applicant made application under section 394 of article 23 of the Code which provides:

"No gas corporation or electrical corporation shall transfer or lease its franchise, works or system, or any part of such franchise, works or system to any other person or corporation or contract for the operation of its works and system, without the written consent of the commission. The permission and approval of the commission to the exercise of a franchise under this sub-title, or to the assignment, transfer or lease of a franchise under this section shall not be construed to revive or validate any lapsed or invalid franchise or to enlarge or add to the powers and privileges contained in the grant of any franchise or to waive any forfeiture. No such corporation shall directly or indirectly acquire the stock or bonds of any other corporation incorporated for or engaged in, the same or similar business, or proposing to operate or operating under a franchise from the same or any other municipality, unless authorized to do so by the commission. Save where stock shall be transferred or held for the purpose of collateral security only with the consent of the commission, no stock corporation of any description, domestic or foreign, other than a gas or electrical corporation, shall purchase or acquire, take or hold, more than ten per centum of the total capital stock issued by any gas corporation or electrical corporation organized or existing under and by virtue of the laws of this state. Nothing herein contained shall be construed to prevent the holding of stock heretofore lawfully acquired. Every contract, assignment, transfer, agreement for transfer of any

stock by or through any person or corporation to any corporation in violation of any provision of this subtitle, shall be void and of no effect, and no such transfer or assignment shall be made upon the books of any gas corporation or electrical corporation, or shall be recognized as effective for any purpose."

The applicant is a holding company incorporated under the laws of Delaware on February 7th, 1927, and authorized, among other things, to acquire and hold shares of stock of corporations engaged in the electric business. By its original charter, filed as an exhibit; it was authorized to issue one thousand shares of capital stock of no par value; of which at the time of the application ten shares had been subscribed for but not issued. There must have been an amended charter, not filed or mentioned in the testimony, because it appears from the testimony and the bond circular that it was authorized to issue twenty thousand shares of seven dollar dividend preferred stock no par value, and two hundred thousand shares of common stock no par value. It owns practically all the common stock of the Electric Public Service Company, the Louisiana Utilities & Ice, Inc., and the Wooster Electric Company, of which the Electric Public Service Company is also a holding company, owning practically all the stock of nine subsidiary companies, operating in Ohio, Oklahoma, Kansas and Colorado, variously in street railways, light and power, natural gas and gas wells, and transmission lines. The Louisiana Utilities & Ice, Inc., operated ice properties in Mississippi, Florida and Texas. The Wooster Electric Company is an operating electric utility in Ohio.

The stocks of all these companies were appraised by the syndicate of bankers, who agreed to underwrite the bond issue, at $7,219,353.

The market value of the stock of the four Maryland companies was estimated by Stanley & Bissell, Inc., the head of the syndicate, at not less than $468,000, as per its letter to the commission. The capital stock of the Maryland com-

panies authorized and outstanding, and the par value per share, are as follows: The Home Electric Company, authorized 2000 shares, outstanding 555 shares, par value $25 each. The Emmitsburg Electric Company, authorized 3000 shares, outstanding 1500 shares, par value $10 each. Antietam Electric Light & Power Company, authorized 180 shares, outstanding 115 shares, par value $100 each. The Midland Electric Light Company, authorized 500 shares, outstanding 500 shares, par value $10 each. The total par value of the outstanding shares is $45,375.

These companies furnish small towns and surrounding country with light and power. Two of them are close enough together to be worked as a unit; the other two are separated from each other and the others by a number of miles. Only the Antietam Company generates any part of its power requirements. This company obtains its power in part from a hydro-electric plant on Antietam Creek. The balance of its requirements and the entire power requirements of the other three companies are purchased from the Potomac Edison Company.

The report of Barrow, Wade, Guthrie & Co., accountants and auditors, shows for the four companies for 1926 net earnings available for interest, depreciation, and federal income taxes, $48,829.32, and, deducting from this interest, depreciation, and federal income tax, the audit shows net profit for the year of $31,621.98. And it shows the financial position of the combined companies as of December 31, 1926:

```
"Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . .$588,437.98
  Debts, bonds . . . . . . . . . . . . . . . . .$50,000.00
  Current and accrued liabilities. .  29,684.79
                              ─────────  79,684.79"
```

"The plant and property account" in the audit of assets "is included at the total value of the property and business of the combined companies, as estimated by Messrs. Day & Zimmerman, Inc."

Thomas O'Hara, at the time of the contract of sale, was the owner of practically all the stock of the four Maryland

corporations, and he had also owned a number of other companies, but decided to retire from the business, and had disposed of all such interests except his stock in these companies, and was therefore desirous of disposing of them also. Before making the contract he employed Day & Zimmerman, Inc., engineers, of Philadelphia, to examine and appraise the properties. Harvey R. Martz, manager of their investigations and reports department, testified that they make investigations of public utility and industrial properties for all purposes; that they cover the whole economic field of the public utility industry. They estimated the reproduction costs of the combined properties to be $346,602, which sum includes $20,000 for working capital, and seven per cent. cost of financing. They estimated the value of the properties and business as of February 1st, 1927, to be substantially $500,000. The report filed is voluminous, minute and in great detail.

On this report appellant, through its agents, agreed to pay for the stocks of said companies $468,000 and to assume the outstanding bonded indebtedness of $50,000. As against this H. Carl Wolf, chief engineer of the commission, the making of whose inventory, he says, was "perforce somewhat hasty," testified that his estimate of reproduction cost, including $13,340 for working capital, less depreciation of $46,305, was $221,700. And adding $20,840 for "going value," he arrived at $242,540, which "in my estimation is the very outside value of the property." He was depending, however, for details, upon a valuation made by William F. Strouse, the valuation engineer of the commission. Mr. Strouse in his testimony admitted that he was handicapped by shortness of time allowed. He said he made his appraisal "in such detail as a man could make on four properties in four days."

The explanation offered for the small capitalization of these companies was that the properties had been in the hands of people who had put back into them the earnings which had not been represented by a proper increase in stock.

Applicant offered testimony tending to show that improvements in the plants were necessary; that the present owner was indisposed to make them; that applicant had ready com-

mand of money and would make such improvements; that better service would be given and the use of electricity increased by active and vigorous management, and by salesmanship and facilities which were at the command of applicant. The manager testified that applicant had paid cash for all the properties it had bought; that it was not buying for speculation with a view to selling again; that its important officials had been in the electrical business for many years and desired to continue in it. There were a number of protests by customers of the Maryland companies against permitting them to be sold to applicant. These protests were based on the price to be paid, which protestants thought was excessive, and that it would be reflected in increased costs to them. The Potomac Edison Company was also a protestant. The only conflict in the testimony was as to the value of the Maryland properties.

The commission did not base its refusal to grant the permission requested on a finding that the price was excessive. On the contrary it said, in the opinion filed, that "it might be considered an arbitrary exercise of the commission's power to refuse approval of the transaction, and to say that the owner of these properties may not be permitted to sell them for the highest amount he can get for them; or to prevent a willing purchaser from buying what he wants at a price he is willing to pay, particularly when the commission has the power to stipulate in its order that the price to be paid should not be considered a base for the fixing of rates." "It is conceded that the par value placed upon stocks is not real evidence of their value. It also might be considered arbitrary for this commission to refuse approval of the application simply because it considered the price to be paid for the stocks too high. It does not decide this matter because it desires to exercise the function of a blue sky commission, because it feels a legal responsibility for all or any part of the proposed $4,000,000 bond issue, or because it feels the price to be paid for the stock is in excess of the real value of the properties."

It then quotes what was said by the commission in an

earlier case, approving the purchase by the Chesapeake & Potomac Telephone Company of the capital stock of the Western Maryland Telephone Company of Allegany County, viz: "In our judgment, this statement of the advantages to be derived from the acquisition of the stock of the Cumberland company by the Chesapeake & Potomac Telephone Company is unanswerable, and while we may not wholly disregard other elements, the controlling consideration with us must always be the general advantage to the public." This was said in a case where the application was granted. It does not follow that the application would in that case have been denied, if the applicant had shown merely that the public would suffer no detriment by the transfer.

The commission then cites the rulings of the New York commission in several cases, in one of which it denied the application of a foreign corporation to acquire the stock of a local corporation because the financial standing of the applicant was not sufficiently strong; in another it denied the application because the property sought to be acquired was remote from the other properties in which the applicant was interested, "and the only consideration seems to be one of financial investment."

The opinion then proceeds to enumerate the claims of the applicant, that it contemplates no increase in rates, and would reduce them if it could be done; that the public would be benefited by a twenty-four hours service in Midland, and by having the four companies operated by one manager, although they would not be connected physically except as to two of them, also by having strong financial interests behind the plants.

The opinion concludes: "These reasons do not seem sufficient, in the view of the commission, to justify it in granting the privileges sought in the application. It cannot see wherein the public will be benefited in the slightest degree. As in the New York case last mentioned, the only consideration seems to be one of financial investment, the only persons to be really benefited being the seller and the purchaser. This commission can see no advantage whatever to the public

in the proposed transaction and the application is therefore denied."

This brings us to the question as to what, if any, are the limitations to the power of the commission in refusing one electrical corporation permission to purchase the stock of another such corporation. Does the act referred to contemplate that the discretion conferred shall be arbitrary, unrestrained, and unregulated? If it did, in that regard it clearly would be unconstitutional. For it would be a delegation to an administrative body of legislative power, without any standard or rule by which that power should be exercised. It has been repeatedly decided in this state that cannot be done. *Baltimore v. Radeke*, 49 Md. 217; *Bostock v. Sams*, 95 Md. 745; *Goldman v. Crowther*, 147 Md. 282; *Tighe v. Osborne*, 149 Md. 349.

But in our opinion the statute is not open to that constitutional objection. Section 394 is not to be considered alone and separately from the rest of the act of which it is a part. By section 359 of article 23 of the Code, it is provided that any company, corporation, association, person or partnership, subject to any of the provisions of this sub-title, or other person or party in interest, shall have the right to proceed in the courts to vacate, set aside or have modified any order of the commission on the ground that such order is unreasonable or unlawful. Its discretion under section 394, therefore, is limited to a reasonable exercise of its power in the public interest. And the test in any given case is: Does the order bear any substantial relation to any public interest that the commission is authorized or required to protect?

In applying this test in the present case, it is important to remember that the commission stands in the place neither of the owner of the properties nor of the Legislature, but is a board of public officers, whose powers are to be found in the statute and are not to be implied or assumed (*People ex rel. Delaware & Hudson Co. v. Stevens*, 134 App. Div. 99, 118 N. Y. Supp. 969; *Penna. R. Co. v. Public Service*

*Commn.,* 126 Md. 59; *Public Service Commn. v. United Rwys. Co.,* 126 Md. 478); that the stocks and properties of the companies here concerned are the private property of their owners (*Interstate Commerce Commn. v. Chicago G. W. Rwy.,* 209 U. S. 108); that the state does not enjoy the freedom of an owner. *Penna. R. Co. v. Public Service Commn., supra.*

In the case of an owner of the stock of such a company, is it within the rule of reason to hold that he may not sell his stock to a corporation unless it can be shown that the public will be benefited by the sale? Or may permission be refused merely because the only consideration moving the parties is one of financial investment which the parties believe to be for their mutual advantage? We think not. If public utilities could be owned only by people whose primary purpose is to benefit the public, few of them would be privately owned. Until human nature changes, enlightened self interest as the moving cause of enterprise is about the best that can be expected. To prevent injury to the public, in the clashing of private interest with the public good in the operation of public utilities, is one of the most important functions of the public service commissions. It is not their province to insist that the public shall be *benefited,* as a condition to change of ownership, but their duty is to see that no such change shall be made as would work to the public *detriment.* "In the public interest," in such cases, can reasonably mean no more than "not detrimental to the public."

It is important to inquire in what respects the public is interested in the transfer of the stock, and thereby the control, of one utility company to another. We think a substantially correct answer is found in the opinion of a majority of the New York commission [*In the matter of Poughkeepsie Light, Heat and Power Company,* 2 N. Y. P. S. C. Reports (Second District), p. 644], viz: "In the case of lighting corporations, such as the applicants, the public served by them is interested in the service rendered by the

corporation and the prices charged therefor; the investing public is interested in the value and stability of the securities issued by them. There may be other matters in which the public is interested, but substantially and in a general way the three particulars enumerated cover the entire field of public interest." As to none of these is any apprehension expressed in the opinion of the commission. Indeed rates and securities are expressly eliminated as factors influencing their decision, nor does the commission find that to grant the permission sought would be detrimental to the public interest, and, because it does not specifically so find, it is most earnestly argued by appellant that its order is unlawful and void.

In *Public Service Commn. v. Byron,* 153 Md. 464, we held that where no hearing or finding of facts was required by the statute as a condition precedent to the action of the commission, and where there was no requirement for the embodiment in the order of a finding of fact, an order would not be vacated because it did not contain a statement of the reason for the order. We there said: "The test of the validity of the order is not the statement of its reason for the order, but the unreasonableness of the order."

And so here, there is nothing requiring the commission to set out the reason for its finding. But our difficulty is, the commission *did* set out a reason for its finding; and, in a measure, negatived other reasons; and the reason on which the order appears to be based does not warrant the order. In these circumstances we feel constrained to reverse the decree appealed from, and to remand the case for further proceedings by the commission, without expressing any opinion as to the merits of the case.

> *Decree reversed and case remanded for further proceedings by the commission, with costs in this court to appellant.*