Missouri Court of Appeals
 Western District

 IN THE MATTER OF THE APPLICATION OF 
 OSAGE UTILITY OPERATING COMPANY, 
  WD83837
 INC., TO ACQUIRE CERTAIN WATER AND
 SEWER ASSETS AND FOR A CERTIFICATE OF  OPINION FILED:
 
 CONVENIENCE AND NECESSITY; PUBLIC 
 WATER SUPPLY DISTRICT NO. 5 OF CAMDEN March 9, 2021
 
 COUNTY, LAKE AREA WASTE WATER 
 ASSOCIATION, INC., MISSOURI WATER 
 ASSOCIATION, INC., AND CEDAR GLEN 
 CONDOMINIUM OWNERS ASSOCIATION, 
 
 INC., 
 APPELLANTS; AND 
 OFFICE OF THE PUBLIC COUNSEL, 
 
 INTERVENOR-APPELLANT, 
 
 V. 
 
 MISSOURI PUBLIC SERVICE COMMISSION, 
 
 RESPONDENT; AND 
 
 OSAGE UTILITY OPERATING COMPANY, 
 INC., 
 
 INTERVENOR-RESPONDENT. 

 APPEAL FROM THE PUBLIC SERVICE COMMISSION

 Before Division One:
 Alok Ahuja, P.J., Thomas H. Newton, and Thomas N. Chapman, JJ.

 This case is before the court on appeal of an order by the Missouri Public Service

Commission (“Commission”) approving a transfer of assets from Osage Water Company

(“OWC”) to Osage Utility Operating Company, Inc., (“Osage Utility”) and granting a certificate

of convenience and necessity to Osage Utility to provide water and sewer service to the OWC
areas. The appellants in this case are Public Water Supply District No. 5 of Camden County

(“PWSD”), Lake Area Waste Water Association, Inc., (“LAWWA”), Missouri Water Association,

Inc., (“MWA” and together with PWSD and LAWWA, “the Joint Bidders”) and Cedar Glen

Condominium Owners Association, Inc., (“Cedar Glen” and, together with PWSD, LAWWA,

and MWA, “Appellants”). The Office of Public Counsel (“Public Counsel”) also appeals. Osage

Utility intervened in the appeal as a respondent. Appellants raise four points on appeal. In their

first point, they contend that the Commission’s order was unlawful because the Commission

lacks the authority to approve a sale unless the selling utility corporation is the party to apply for

the Commission’s approval. In their remaining points, they contend that the Commission’s order

was unreasonable because: the Commission arbitrarily failed to consider alternatives in

determining whether the sale of OWC’s assets to Osage Utility was detrimental to the public

interest; the Commission’s decision to approve the sale was not based on competent and

substantial evidence; and competent and substantial evidence did not support the Commission’s

grant of a Certificate of Convenience and Necessity (“CCN”) to Osage Utility. Public Counsel

raises two points on appeal, the first of which makes arguments similar to Appellants’ first point.

Public Counsel’s second point asserts that the Commission arbitrarily disregarded evidence.

Because we find that the Commission’s order was both lawful and reasonable, we affirm.

 Background

 The Public Service Commission is a Missouri agency responsible for regulating the

conduct of certain utility providers, including water and sewer corporations. See § 386.250.1

Before a regulated utility can provide service, it must obtain a CCN from the Commission. See §

1
 Unless otherwise indicated, all statutory references are to RSMo 2016, as supplemented.

 2
393.170. Before a regulated utility can sell assets that are necessary or useful to the public being

served by the assets, the Commission must approve the transaction. See § 393.190. This appeal

arises out of Osage Utility’s2 application for approval to purchase the assets of the OWC and for

a grant of the OWC’s CCN, which the Commission approved.

 In 1989, the Commission granted OWC a CCN to provide water and sewer service in the

Lake of the Ozarks area. In 2002, the Commission determined that OWC had been effectively

abandoned by its owners, and that OWC was unable or unwilling to provide safe and adequate

service to its customers. In 2005, OWC was ordered into permanent receivership by the Circuit

Court of Camden County, pursuant to section 393.145. The circuit court further ordered the

receiver to liquidate the OWC assets. Over the years, the receiver marketed the OWC assets and

received multiple bids, none of which resulted in a sale.

 After being unable to liquidate the OWC assets, the receiver sought and received the

circuit court’s authorization to file for Chapter 11 bankruptcy. OWC filed for Chapter 11

bankruptcy in federal bankruptcy court. A bankruptcy trustee was appointed. In October of

2018, the bankruptcy trustee held an auction to liquidate the OWC assets. Central States, an

affiliate of Osage Utility, negotiated an agreement with the trustee that gave Central States the

right to match any bid at the bankruptcy auction. The Joint Bidders3 also submitted bids at the

2
 Osage Utility was formed for the purpose of purchasing and operating the OWC systems. Osage Utility is a for-
profit corporation, and a wholly owned subsidiary of CSWR, LLC, which owns several other Commission approved
utility companies in Missouri. Central States Water Resources, Inc., (“Central States”), is the managing affiliate for
CSWR, LLC.
3
 The Joint Bidders are PWSD, LAWWA, and MWA. PWSD is a public governmental body that provides water
and sewer service in the Camdenton, Missouri area. LAWWA is a non-profit sewer service provider operating in
the Camdenton, Missouri area. MWA is a non-profit water service provider operating in the Camdenton, Missouri
area. The Joint Bidders also wish to purchase and operate the OWC assets. Although these companies placed a
collective bid on the OWC assets, they did not plan to collectively operate the entirety of the OWC service areas.
Rather, PWSD would service the Cedar Glen area; MWA would provide water service to the remaining areas; and
LAWWA would provide sewer service to the remaining areas.

 3
auction. The Joint Bidders had the highest bid at $800,000 until Central States matched that bid.

Central States was declared the successful bidder and entered into a purchase agreement with

OWC. The agreement was conditional upon Osage Utility obtaining regulatory approval from

the Commission. The Joint Bidders were declared the First Back-Up Bidders and also entered

into a purchase agreement with OWC. Under the terms of their agreement, if Osage Utility

failed to purchase the OWC systems, the Joint Bidders would be obligated to purchase the OWC

assets. The bankruptcy court approved both purchase agreements.

 In December of 2018, Osage Utility filed an application with the Commission for

approval of its acquisition of the OWC assets and CCN. Osage Utility filed an amended

application in February of 2019. Opposing the transfer, the Joint Bidders and Cedar Glen4 filed

motions for intervention, which were granted. Public Counsel was also a party to the case

pursuant to section 386.710(2) and Rule 20 CSR 4240-2.010(10). Public Counsel also opposed

the transfer.

 Before the Commission, a hearing was held regarding Osage Utility’s Application, during

which all parties presented evidence and testimony. Thereafter, the Commission issued its

Report and Order approving Osage Utility’s application to acquire the OWC systems and

granting Osage Utility a CCN.5 The Commission found that a transfer of the OWC assets would

4
 Cedar Glen is a not-for-profit condominium owners association representing roughly half of OWC’s water and
sewer customers. It opposes the transfer of the OWC systems to Osage Utility. It would prefer to have PWSD
annex the Cedar Glen condominiums into its territory. Cedar Glen filed a joint appeal along with the Joint Bidders.
When we refer to Appellants, we refer to Cedar Glen, PWSD, LAWWA, and MWA. We acknowledge that Public
Counsel filed a separate appeal and is also an appellant in this case, but we refer to Public Counsel separately with
the hope that unnecessary confusion is avoided.
5
 Osage Utility had also applied for an acquisition incentive pursuant to 20 CSR 4240-10.085, which the
Commission denied.

 4
not be detrimental to the public interest after balancing the potential benefits and detriments of

the transfer. During the hearing and in the briefs filed with the Commission, there was a dispute

between the parties as to whether the Commission should evaluate Osage Utility’s application

against the current state of the OWC systems, or if Osage Utility needed to show that it was a

better alternative to the Joint Bidders’ proposal. Other disputes were related to disparities

between the financing plans and rate and repair estimates of Osage Utility and the Joint Bidders.

 Commission Staff endorsed Osage Utility’s application, finding it to be a comprehensive

plan for bringing the system into compliance and providing safe and adequate service to the

OWC service areas.6 The Commission found Osage Utility’s planned improvements to be

reasonable, and noted that any improvements would be evaluated for prudence and must be

approved by the Commission before affecting consumer rates.

 Staff did not feel comfortable endorsing the Joint Bidders’ proposal because it was “too

incomplete.” Staff analyzed the proposal of the Joint Bidders but did not perform in-depth cost

studies or an in-depth review of the Joint Bidders’ proposal because Staff had only the

application of Osage Utility before it, and Staff found that the Joint Bidders had not provided a

complete cost estimate or a complete proposal. The Commission found that (among the Joint

Bidders) MWA and LAWWA had not evaluated the necessary improvements in their service

areas and did not present any estimates for improvements. The Commission found that PWSD

(also amongst the Joint Bidders) presented a plan that was predicated on connecting Cedar Glen

to the adjacent PWSD service territory, which would require laying pipe under U.S. Highway 54,

6
 The Commission’s grant of approval was conditional on Osage Utility agreeing to numerous conditions
recommended by Commission Staff, to which Osage Utility agreed.

 5
but that PWSD had not obtained the necessary permissions and had only general estimates

regarding the interconnection which could take more than two years to complete.

 With respect to the rate estimates of Osage Utility and the Joint Bidders, the Commission

stated:

 During the hearing, an estimate of [proposed buyer] Osage Utility’s combined rates
 for water and sewer service was presented based on the pro forma financial
 statements projecting revenues after Osage Utility’s initial rate case and based on
 the improvements it identifies as needed. That estimated rate, if approved during a
 rate case, would be a significant increase for [proposed seller] Osage Water
 Company’s customers and would be substantially more than the rates proposed by
 the Joint Bidders. If all these estimates and proposed rates were to become reality,
 the higher rates charged by Osage Utility could be a financial detriment to Osage
 Water Company’s customers.

 The Commission also recognized other potential benefits if the Joint Bidders were to

become owners of the OWC assets, such as greater participation by customers due to the Joint

Bidders’ organizational structures, the fact that the Joint Bidders had a local presence and the fact

that residents represented by Cedar Glen preferred PWSD as their service provider.

 However, the Commission found that Osage Utility’s ownership would definitively

provide many benefits over the current OWC systems, including providing stability and avoiding

further delay. The Commission reiterated that Osage Utility’s proposal was comprehensive,

whereas the Commission did not have the opportunity to truly vet the Joint Bidders’ proposal due

to its incompleteness.

 In concluding its analysis, the Commission stated:

 After weighing each of these benefits and detriments, the Commission finds that
 Osage Utility has met its burden to show that a grant of authority to purchase the
 Osage Water Company assets and a grant of a CCN to operate the Osage Water
 Company system is not detrimental to the public interest if granted with the agreed
 conditions proposed by Staff. The evidence that the ratepayers will be charged
 unreasonably higher rates if Osage Utility owns the systems is not persuasive.
 There are too many unknowns to assume that the alleged lower rates to be charged

 6
 by the Joint Bidders will be so significant as to make the transfer to Osage Utility
 detrimental to the public. Further, any rate increases for Osage Utility will only be
 authorized by the Commission if found to be just and reasonable.

 After the Commission issued its order, Appellants and Public Counsel timely filed

applications for rehearing, which were denied. Appellants and Public Counsel now appeal to this

court.

 Osage Utility’s Motion to Dismiss as Moot

 Before addressing the merits of this appeal, we address Osage Utility’s motion to dismiss

the appeal as moot. Osage Utility points out that the sale of the OWC assets to Osage Utility

closed in June of 2020 while this appeal was pending. Because the closing has already occurred,

Osage Utility argues, there is no longer an active, justiciable controversy.

 We are “obligated, either upon motion of a party or acting sua sponte, to examine an

appeal for mootness because mootness implicates the justiciability of a controversy and is a

threshold issue for appellate review.” In re Missouri-American Water Co., 516 S.W.3d 823, 828

(Mo. banc 2017) (quoting Missouri Mun. League v. State, 465 S.W.3d 904, 906 (Mo. banc

2015)). “A case on appeal becomes moot when circumstances change so as to alter the position

of the parties or subject matter so that the controversy ceases and a decision can grant no relief.”

State ex rel. Intercon Gas, Inc. v. Pub. Serv. Comm’n, 848 S.W.2d 593, 596 (Mo. App. W.D.

1993). If a case is moot, the justiciability of the case is implicated, and dismissal is generally

proper. In re Estate of Washington, 277 S.W.3d 777, 780 (Mo. App. E.D. 2009).

 “However, the fact that an act authorized by the [Public Service Commission] has been

completed pending appeal does not of itself render an appeal moot.” Intercon Gas, Inc., 848

S.W.2d at 596. The Missouri Supreme Court has previously held that an appeal of a Commission

decision approving the sale of utility properties is not rendered moot by the closing of the

 7
transaction. State ex rel. Consumers Pub. Serv. Co. v. Pub. Serv. Comm’n, 180 S.W.2d 40, 43-44

(Mo. banc 1944). This is true because the purpose of judicial review of Commission orders is to

“determine the validity of such orders[.]” Id. at 44. If the order authorizing the sale of assets is

invalid, it can be set aside and declared invalid. Id.

 A similar result was reached in Intercon. 848 S.W.2d at 596. In that case, the

Commission had granted a certificate authorizing a utility to construct a pipeline. Id. Upon

appeal by a competing company, it was argued that the case was moot because the pipeline had

already been constructed during the pendency of the appeal. Id. The court found that if the

Commission’s order was determined to be invalid, the court had the power to set aside the

Commission’s order and remand the cause to the Commission. Id. The appeal was, therefore,

not moot. Id.

 Moreover, “[f]or the quasi-judicial work of the PSC to comport with basic notions of

separation of powers, its decisions must be capable of being tested by (and receiving the

imprimatur of) the judicial branch of this state. This can be accomplished only by way of

meaningful and unobstructed judicial review as provided in the Missouri Constitution.” State ex

rel. Praxair, Inc. v. Missouri Pub. Serv. Comm’n, 344 S.W.3d 178, 186 (Mo. banc 2011).

Consistent with the notion of separation of powers, the legislature has expressly provided for

judicial review of Commission decisions “for the purpose of having the reasonableness or

lawfulness of the original order or decision . . . inquired into or determined[.]” § 386.510.

Section 386.510 further provides that, upon submission of the case, “the court of appeals shall

render its opinion either affirming or setting aside, in whole or in part, the order or decision of

the commission under review.”

 8
 In the matter before us, a justiciable controversy remains regarding the validity of the

Commission’s order. If we determine the Commission’s order is invalid as unlawful or

unreasonable, we may set it aside. § 386.510. This appeal is not moot. Osage Utility’s motion

to dismiss is denied.

 Standard of Review

 We review the order of the Commission pursuant to section 386.510. Our review is two-

pronged. In re Missouri-American Water Co., 516 S.W.3d at 827 (citing State ex rel. AG

Processing, Inc. v. Pub. Serv. Comm’n of State, 120 S.W.3d 732, 734 (Mo. banc 2003)). First,

we determine whether the Commission’s order is lawful. Id. Second, we determine whether the

order is reasonable. Id. “The Commission’s order is presumed valid, and the burden of showing

the order is unlawful or unreasonable rests with the appellant.” Grain Belt Express Clean Line,

LLC v. Pub. Serv. Comm’n, 555 S.W.3d 469, 471 (Mo. banc 2018).

 An order’s lawfulness “is determined by whether statutory authority for its issuance

exists, and all legal issues are reviewed de novo.” Praxair, 344 S.W.3d at 184 (internal quotation

omitted). An order is reasonable “if it is supported by substantial, competent evidence on the

whole record, it is not arbitrary or capricious, and it is not based on an abuse of its discretion.”

Mo. Pub. Serv. Comm’n v. Union Elec. Co., 552 S.W.3d 532, 539 (Mo. banc 2018) (internal

quotations, citation and brackets omitted).

 In reviewing whether the decision of an administrative agency is supported by competent

and substantial evidence on the whole record, we “examine the whole record to determine if it

contains sufficient competent and substantial evidence to support the award, i.e., whether the

award is contrary to the overwhelming weight of the evidence.” Hampton v. Big Boy Steel

 9
Erection, 121 S.W.3d 220, 222-23 (Mo. banc 2003) (citing Wood v. Wagner Elec. Corp., 197

S.W.2d 647, 649 (Mo. banc 1946)).

 This does not mean that the reviewing court may substitute its own judgment on
 the evidence for that of the administrative tribunal. But it does authorize it to decide
 whether such tribunal could have reasonably made its findings and reached its
 result, upon consideration of all the evidence before it; and to set aside decisions
 clearly contrary to the overwhelming weight of the evidence.

Wood, 197 S.W.2d at 649.7 We defer to the Commission on matters of credibility. Id. If

substantial evidence supports either of two reasonable but conflicting conclusions, we are bound

by the findings of the Commission. AG Processing, Inc., 120 S.W.3d at 735.

 Analysis

 Appellants raise four points on appeal. In their first point, Appellants argue that the

Commission’s order is unlawful because the Commission lacks the authority to approve the sale

of a regulated utility unless the seller is the specific party to apply for the Commission’s

approval. In their remaining points, they contend that the Commission’s order was unreasonable

because: the Commission arbitrarily failed to consider alternatives in determining whether the

sale of OWC’s assets to Osage Utility was detrimental to the public interest; the Commission’s

decision to approve the sale was not based on competent and substantial evidence; or because

competent and substantial evidence did not support the Commission’s grant of a Certificate of

Convenience and Necessity (“CCN”) to Osage Utility.

7
 Our review of administrative agency decisions for competent and substantial evidence is different than our review
of a substantial evidence challenge in an appeal from a court-tried case. In a substantial evidence challenge in an
appeal from a court-tried case, appellate courts view the evidence in the light most favorable to the judgment, accept
as true the evidence and inferences favorable to the trial court’s decree, and disregard all contrary evidence and
inferences. Ivie v. Smith, 439 S.W.3d 189, 200 (Mo. banc 2014). In reviewing the findings and decisions of an
administrative agency for competent and substantial evidence, we do not view the evidence in the light most
favorable to the award, Hampton, 121 S.W.3d at 223, and we consider all of the evidence that was before the
agency, “including the evidence and inferences that the agency rejected in making its findings.” See Seck v. Dep’t of
Transp., 434 S.W.3d 74, 79 (Mo. banc 2014).

 10
 Public Counsel raises two points on appeal. In point one, Public Counsel makes similar

arguments as Appellants regarding the lawfulness of the Commission’s order due to the fact that

the seller was not the party to apply for the Commission’s approval. Public Counsel’s second

point asserts that the Commission arbitrarily disregarded evidence.

 Point One

 In their first point on appeal, Appellants contend that the Commission erred in approving

the transfer of the OWC assets to Osage Utility, because the Commission’s order was unlawful.

In particular, Appellants argue that under section 393.190.1, the Commission lacks the authority

to authorize a sale of a regulated utility’s assets unless the selling utility is the party who has

applied for authorization. Public Counsel makes a similar allegation of error in its first point on

appeal. Thus, we examine these points together.

 The lawfulness of orders issued or actions taken by the Commission depends
 primarily on whether the Commission had the statutory power and authority to act.
 The Commission is an administrative body created by statute and has only such
 powers as are expressly conferred by statute and reasonably incidental thereto. The
 Commission’s authority, therefore, must come from the statutes, and the
 Commission merely carries out the public policy declared by the Missouri
 Legislature.

Pub. Serv. Comm’n v. Mo. Gas Energy, 388 S.W.3d 221, 230 (Mo. App. W.D. 2012) (internal

quotations, citations, and brackets omitted).

 Our “primary rule of statutory interpretation is to give effect to legislative intent as

reflected in the plain language of the statute at issue.” Parktown Imports, Inc. v. Audi of

American, Inc., 278 S.W.3d 670, 672 (Mo. banc 2009). We resort “to other rules of statutory

interpretation only when the plain meaning of the statute is ambiguous or defeats the purpose of

the statute.” Karney v. Dep’t of Lab. & Indus. Relations, 599 S.W.3d 157, 162 (Mo. banc 2020)

(citing Ivie v. Smith, 439 S.W.3d 189, 202 (Mo. banc 2014)). “Other rules of statutory

 11
interpretation, which are diverse and sometimes conflict, are merely aids that allow this Court to

ascertain the legislature’s intended result.” Parktown Imports, Inc., 278 S.W.3d at 672 (citing

Edwards v. St. Louis County, 429 S.W.2d 718, 722 (Mo. banc 1968)). “Words in a statute are not

read in isolation but, rather, are read in the context of the statute to determine their plain and

ordinary meaning.” Kehlenbrink v. Dir. of Revenue, 577 S.W.3d 798, 800 (Mo. banc 2019).

 Section 393.190.1 provides, in relevant part:

 No . . . water corporation or sewer corporation shall hereafter sell . . . the whole or
 any part of its franchise, works or system, necessary or useful in the performance
 of its duties to the public . . . without having first secured from the commission an
 order authorizing it so to do. Every such sale . . . made other than in accordance
 with the order of the commission authorizing same shall be void. . . . Any person
 seeking any order under this subsection authorizing the sale . . . of any . . . water
 corporation, or sewer corporation, shall, at the time of application for any such
 order, file with the commission a statement, in such form, manner and detail as the
 commission shall require, as to what, if any, impact such sale . . . will have on the
 tax revenues of the political subdivisions in which any structures, facilities or
 equipment of the corporations involved in such disposition are located. . . .

 The first sentence of the provision provides a limitation on the power of a water or sewer

corporation to sell assets that are useful in the performance of its duties to the public. Before

such a sale can occur, the utility corporation must “hav[e] first secured” from the Commission

“an order authorizing it” to do so. The second sentence indicates that if a sale occurs without the

authorization order of the Commission, or in a manner not in accord with such an order, then the

sale is void. Neither of these sentences expressly addresses the procedure of pursuing such an

order or who or which entity must initiate a proceeding seeking such an order. Neither of these

sentences indicate that the legislature intended to limit the Commission’s power to issue an

authorizing order based on the party who applied for the order. That is, when, as here, the

Commission enters an order approving the sale of assets from a utility corporation to a buyer, a

seller can fairly be considered as “having . . . secured” such an order even though the seller itself

 12
was not the applicant. In this case, the Commission’s order stated: “Osage Water Company and

Osage Utility Operating Company, Inc. are authorized to enter into, execute, and perform in

accordance with the terms described in the Agreement for Sale of Utility System[.]” With this

order, which is addressed to both buyer and seller, OWC has “secured” an order of the

Commission “authorizing it” to sell its assets as required by § 393.190.1.

 Looking solely at the first sentence of section 393.190.1, it is perhaps arguable that it is

implied that the legislature contemplated that the selling utility would be the applicant. But,

reading the first sentence of the provision in the context of the whole, we note that when the

statute goes on to speak of the application procedure, it does so with different and broader

language than it used in placing limitations on the power of the utility to sell. The fourth

sentence of section 393.190.1 relates specifically to the application procedure and sets forth

filing requirements for the party seeking an order of approval from the Commission. These

requirements apply to “any person seeking any order under this subsection[.]” That these

requirements are addressed to “any person” seeking such an order rather than to a water or sewer

corporation (as was the first sentence’s limitation) indicates that a broader category of subjects

may seek the order.

 The sale and the pursuit of the order are necessarily separate events, as the order

approving the sale must be obtained prior to the sale. The Commission’s authorizing order, then,

does not make the sale occur; rather, it simply allows the seller to enter into and execute a sale

that the seller otherwise wishes to occur. When section 393.190.1 addresses limitations on the

sale, it places those limitations on the selling utility corporation. This is to be expected as the

selling utility is the party operating the assets in service of the public and is subject to the control

 13
of the Commission.8 When the Commission addresses the procedural requirements of the

application, it places those requirements on a different and broader category of subjects: “any

person seeking any order[.]” This distinction in the plain language of the statute suggests that

the legislature did not intend to restrict the subjects who may apply for an order or to deprive the

Commission of the power to authorize a sale based on the party to apply for the order.

 In arguing that the selling utility corporation must be the applicant for the order,

Appellants and Public Counsel rely heavily on language from our court’s prior decision in City

of O’Fallon v. Union Elec. Co., 462 S.W.3d 438, 443 (Mo. App. W.D. 2015). The issue in

O’Fallon was whether the Commission had the power to force an unwilling utility corporation to

sell its assets. O’Fallon, 462 S.W.3d at 443. The O’Fallon court affirmed the Commission’s

dismissal of the complaint of two cities, which asked the Commission to force a utility to sell its

assets, and held that section 393.190 did not grant the Commission such authority because the

statute contemplates a willing seller. Id. The court reasoned that the statute referred “to

approval after an affirmative, voluntary act by the seller, i.e., the seller’s petitioning and securing

the Commission’s order authorizing the sale.” Id.9

8
 In theory, a buyer could be any individual or entity and may not even intend to use the property to provide utility
service.
9
 Section 393.190.1 only provides the Commission with the power to authorize a sale, but not to compel it. A
common definition of “authorize” would not include the power to compel. Merriam-Webster defines “authorize” as
“to endorse, empower, justify, or permit by or as if by some recognized or proper authority (such as custom,
evidence, personal right, or regulating power).” See Merriam-Webster, https://www.merriam-
webster.com/dictionary/authorize (last visited Feb. 23, 2021). Additionally, Missouri courts analyzing the term
“authorize” have concluded that the term permits a result but does not compel it. See, e.g., Crecelius v. Chicago, M.
& St. P. Ry. Co., 205 S.W. 181, 185–86 (Mo. banc 1918) (holding that where a federal statute required a reduction
in damages if the plaintiff was contributorily negligent, jury instruction was erroneous where it stated that plaintiff’s
contributory negligence would authorize that the damages assessed by the jury would be diminished) (“This word as
here means ‘to warrant; to justify; to furnish a ground for.’ Webster's Dict. It does not connote the idea that pursuant
to the statute the jury must so diminish the damages. It merely permits the jury to do so, leaving it to the discretion of
the jury whether they actually do so or not.”) (second emphasis added).

 14
 The facts in the instant matter are quite distinct from those in O’Fallon. As an initial

matter, O’Fallon was not a proceeding under section 393.190.1 reviewing an application for

Commission authorization of a sale of utility assets; rather, it involved a complaint filed by two

cities that sought to force the sale of a utility’s assets to the cities. Because O’Fallon was not a

section 393.190.1 proceeding, the O’Fallon court had no occasion to address the procedures

incident to such an application. Moreover, in this case, the selling utility (OWC) had consented

to (and contracted for) the sale but did not file the application to authorize the sale; whereas the

proposed selling utility in O’Fallon did not consent to the sale and did not file the application to

authorize the sale. In O’Fallon, we found it “axiomatic that, where the utility does not wish to

sell its property, it will not file the necessary application, and there will be no contract and no

approval or board resolution to attach to the application.” O’Fallon, 462 S.W.3d at 443.

Appellants argue that O’Fallon requires that, where the utility does wish to sell, it must file the

necessary application. O’Fallon does nothing of the sort, nor could it. O’Fallon does not

purport to address the situation where the seller was willing to sell, but had not filed the

application. Rather, O’Fallon correctly points out the obvious—that an unwilling seller will not

file an application, and concludes, as a result, there will “be no contract and no approval or board

resolution” manifesting the “willingness” required under section 393.190. Put another way, it is

not inconsistent to conclude (as we did in O’Fallon) that an unwilling seller would not file an

application to sell its property, that any application would therefore lack a contract or agreement

of sale, and that, lacking the “willingness” of the selling utility, the Commission would not have

authority to even consider a complaint to force a sale; and to also conclude (as we do herein)

that, where there is a willing seller, that another entity could file the application for authority to

sell, which could include the documents manifesting the willingness of the selling utility (such as

 15
the contract for sale) necessary to entertain the application to sell. Put yet another way, O’Fallon

addresses the necessity of the seller’s willingness, but did not (nor could it) address the various

means by which a seller might manifest the “willingness” required under section 393.190.10

 The rule that effectively replaced the rule addressed in O’Fallon, and which applies to the

application in the instant case, Rule 20 CSR 4240-10.105, contains essentially the same filing

requirements for applications for Commission approval. Tellingly, Osage Utility, as the buyer-

applicant, was able to comply with all of these requirements, and the voluntary nature of the sale

was expressed in the sales agreement, pursuant to 20 CSR 4240-10.105(1)(B). Appellants argue

further that 20 CSR 4240-2.060 also requires a number of things related to the applicant seller.

However, 20 CSR 4240-2.060 does not refer to a seller. Rather, it refers to the requirements of

an “applicant.” For purposes of 20 CSR 4240-2.060, an applicant is defined as “any person, as

defined herein, or public utility on whose behalf an application is made.” 20 CSR 4240-2.010(1)

(emphasis added). A “person” is defined to “include[] a natural person, corporation,

10
 The O’Fallon court noted that section 393.190.1 referred “to approval after an affirmative, voluntary act by the
seller[.]” Id. The O’Fallon court did conclude that the affirmative, voluntary act would be “the seller’s petitioning
and securing the Commission’s order authorizing the sale.” Id. However, section 393.190.1 does not actually refer
to “petitioning” and, when the provision refers to the seller “having first secured” the order, it does so in the context
of the limitation on the seller’s power to sell rather than in the context of the application procedure. As discussed
above, when the statute refers to the process of obtaining an order, it directs its filing requirements to “any person
seeking any order” under section 393.190.1. Since the provision authorizes a broader category of subjects to seek an
order approving the sale, it follows that the seller itself need not be the applicant.

 The O’Fallon court also analyzed a number of regulations promulgated by the Commission. Rule 4 CSR 240-
3.110 was titled “Filing Requirements for Electric Utility Applications for Authority to Sell, Assign, Lease or
Transfer Assets,” which mirrors the language of section 393.190.1 addressing what the transferor cannot do without
permission (“sell, assign, lease, transfer” etc.). This rule required the applicant to provide a copy of the agreement
of sale and “verification of proper authority by the person signing the application or a certified copy of resolution of
the board of directors of each applicant authorizing the proposed action.” O’Fallon, 462 S.W.3d at 443 (quoting 4
CSR 240-3.110). The court in O’Fallon noted that “[i]t is axiomatic that, where the utility does not wish to sell its
property, it will not file the necessary application, and there will be no contract and no approval or board resolution
to attach to the application.” Id. Again, while we agree with the holding of the O’Fallon court, we find that the
instant case is distinct in that the sale was voluntary, and the buyer as applicant was able to comply with the filing
requirements.

 16
municipality, political subdivision, state or federal agency, and a partnership.” 20 CSR 4240-

2.101(11). Thus, the regulations specifically contemplate that an application may be made on

behalf of another person or public utility.11

 Though we do not find the language of section 393.190.1 to be ambiguous, if we were to

so find, our conclusion that the seller need not be the party to apply for the Commission’s

approval is consistent with and gives effect to the purpose of section 393.190.1. See State ex rel.

Fee Fee Trunk Sewer, Inc. v. Litz, 596 S.W.2d 466, 468 (Mo. App. E.D. 1980) (“The obvious

purpose of this provision is to ensure the continuation of adequate service to the public served by

the utility.”). That is, the provision’s purpose is to prevent a regulated utility from selling assets,

which are necessary or useful to the service provided, to a buyer who is unwilling or unable to

provide adequate service. Thus, the Commission must approve the transaction prior to its

occurrence. But in a situation, as here, in which adequate service is not being provided by the

utility corporation in the first place, the purpose of the statute is obstructed if we construe it as

containing limitations on the Commission’s power to ensure that adequate service is provided.

None of the language of the statute suggests that it is intended as a limitation on the power of the

Commission to approve or disapprove of a voluntary sale.12 Although the statute prevents a

11
 Counsel for the bankruptcy trustee sent a letter to Commission Staff explaining the bankruptcy sale process in
order to assist Commission Staff in its investigation related to Osage Utility’s application. The letter stated that the
sale was conditional upon Commission approval of Osage Utility’s application. That the sale required Osage Utility
to seek and gain Commission approval is an indication that Osage Utility was seeking approval, at least in part, on
behalf of the trustee. Additionally, the sales agreement indicated that Buyer and Seller agreed to assist each other in
the process of gaining regulatory approval, and the agreement set a deadline for Osage Utility to submit its
application to the Public Service Commission.
12
 We note that neither Appellants nor Public Counsel argued in their motions for rehearing that the hearing was
affected by the fact that the seller was not the applicant. We also note that no objections were raised based on the
seller’s absence at any point leading up to or during the hearing. The issue was first raised when post-hearing briefs
were filed with the Commission.

 17
selling utility from selling without permission, it addresses the filing requirements of the

application process to “any person seeking any order[.]”

 Appellants’ and Public Counsel’s first points are denied.

 Point Two

 In their second point on appeal, Appellants argue that the Commission’s decision was

unreasonable because it failed to consider alternatives in determining whether the transfer of

assets to Osage Utility was detrimental to the public interest. Appellants contend that, in

determining whether a sale of utility assets is detrimental to the public interest, the Commission

is required to withhold approval of a sale of assets unless it is the best alternative. Because the

best alternative must be considered, Appellants contend, the Commission erred when it

arbitrarily disregarded the Joint Bidders’ proposal. In its second point, Public Counsel argues

that the Commission arbitrarily disregarded evidence of the Joint Bidders’ potential to operate

the OWC, and the potential harm to customers of unnecessarily higher rates. In light of the

arguments presented, we first discuss what the Commission is required to consider in applying

the “not detrimental to the public interest” standard. Then, we address the parties’ contentions

regarding the considerations and evidence they claim were arbitrarily disregarded.

 All parties agree that it is appropriate for the Commission to approve the sale of the OWC

assets to Osage Utility unless the sale would be detrimental to the public interest. See Fee Fee

Trunk Sewer, 596 S.W.2d at 468. However, the parties disagree as to what the application of this

standard entails. Appellants argue that a sale is detrimental to the public interest unless the

applicant shows that the sale is the best alternative. The Commission contends that it is not

required to examine every possible alternate scenario in determining whether a proposed sale

will be detrimental to the public.

 18
 Prior to the sale of certain assets of a regulated utility, the Commission must approve the

transfer. § 393.190.1. “The obvious purpose of this provision is to ensure the continuation of

adequate service to the public served by the utility.” Fee Fee Trunk Sewer, 596 S.W.2d at 468.

In determining whether a transfer should be approved, the Commission determines whether the

transfer is detrimental to the public interest. AG Processing, Inc., 120 S.W.3d at 735 (citing State

ex rel. City of St. Louis v. Pub. Serv. Comm’n, 73 S.W.2d 393, 400 (Mo. banc 1934)).

 The Missouri Supreme Court announced the “not detrimental to the public interest”

standard in a 1934 case. City of St. Louis, 73 S.W.2d at 400. In that case, the Missouri Supreme

Court recognized that one of the most important functions of the Commission is to prevent injury

to the public “in the clashing of private interest with the public good in the operation of public

utilities.” Id. (quoting Elec. Pub. Utilities Co. v. West, 140 A. 840, 844 (Md. 1928)). At the same

time, the court recognized that a property owner should be allowed to sell property unless doing

so “would be detrimental to the public.” City of St. Louis, 73 S.W.2d at 400. Quoting with

approval a Maryland case, the Missouri Supreme Court indicated that it is not the province of the

Commission “to insist that the public shall be benefited, as a condition to change of ownership,

but [the Commission’s] duty is to see that no such change shall be made as would work to the

public detriment.” Id. (quoting Elec. Pub. Utilities Co., 140 A. at 844). In setting the “not

detrimental to the public” standard, the Missouri Supreme Court overruled in part a prior

decision which required the Commission to find that the public would be benefitted by the

transfer of assets. Id. (overruling in part State ex rel. City of St. Louis v. Pub. Serv. Comm’n, 56

S.W.2d 398 (Mo. 1932)).

 Missouri courts have consistently applied this standard since its origin. See AG

Processing, Inc., 120 S.W.3d at 735; Environmental Utilities, LLC v. Pub. Serv. Comm’n, 219

 19
S.W.3d 256, 265 (Mo. App. W.D. 2007); Fee Fee Trunk Sewer, 596 S.W.2d at 468 (“The

Commission may not withhold its approval of the disposition of assets unless it can be shown

that such disposition is detrimental to the public interest.”).

 In this matter, the Commission indicated that determining whether a sale is detrimental to

the public interest “is a balancing process,” which requires the Commission to perform “a cost

benefit analysis in which all of the benefits and detriments in evidence are considered.”

Although no exhaustive list has been announced of the considerations that may influence

whether a sale is detrimental to the public, Missouri courts have held that the Commission is to

consider all relevant factors in issuing its decisions and orders. See AG Processing, 120 S.W.3d

at 736 (holding that the Commission erred in failing to consider the reasonableness of an

acquisition premium as part of a cost analysis in evaluating whether a proposed merger would be

detrimental to the public). In the context of the Commission’s approval of a transfer of regulated

utility assets, the Commission’s decision will be found to be unreasonable if it “erroneously

ignores evidence that may have substantially impacted the weight of the evidence evaluated to

approve” the transaction. See State ex rel. Praxair, Inc. v. Pub. Serv. Comm’n, 344 S.W.3d 178,

184 (Mo. banc 2011) (internal quotations omitted).

 In support of their contention that the Commission must consider which of several

alternatives most benefits the public, Appellants point to a prior case in which the court affirmed

an order of the Commission that denied authorization of a sale of assets on the basis that the sale

would be detrimental to the public interest. Env’t. Utilities, 219 S.W.3d at 266.13 The

Environmental Utilities court found that competent and substantial evidence supported the

13
 Interestingly, Environmental Utilities involved a proposed sale of some (but not all) of the same OWC assets as
does the matter before us. 219 S.W.3d at 266.

 20
Commission’s determination. Id. The court noted that the sale only disposed of part of OWC’s

assets, “leaving the bulk of the sewer customers to be served by the distressed utility.” Id. That

is, the bulk of the OWC’s customers “would continue to receive substandard service from a

distressed utility.” Id. The court also noted that the customers serviced by the transferred assets

“could conceivably see the cost of sewer service double.” Id. Based on these considerations, the

court found that the “Commission could well determine that such a sale was detrimental to the

public, consistent with the requirement of Fee Fee Trunk Sewer, 596 S.W.2d at 468.” Env’t.

Utilities, 219 S.W.3d at 266.

 Environmental Utilities, then, did nothing to alter the standard set forth in City of St.

Louis and reiterated in Fee Fee Trunk Sewer. Rather, it reaffirmed that the “Commission may

not withhold its approval of the disposition of assets unless it can be shown that such disposition

is detrimental to the public interest.” Env’t. Utilities, 219 S.W.3d at 265 (quoting Fee Fee Trunk

Sewer, 596 S.W.2d at 468). The Commission could reasonably consider the effect of the transfer

of some of the assets on the customers that would be stranded with a distressed utility and

substandard service, a consideration that would necessarily entail the potential for an alternative

future transfer. See id. at 266. However, the Environmental Utilities court did not alter the not

detrimental to the public standard, nor did it give privileged status to the possibility of alternative

transfers. It simply reinforced that the Commission could consider all relevant factors in

determining whether a transfer was detrimental to the public interest. See AG Processing, 120

S.W.3d at 736.

 We therefore conclude that an applicant need not show that the transfer will produce the

greatest benefit to the public—or any net benefit at all—but only that the transfer will not work

to the detriment of the public. City of St. Louis, 73 S.W.2d at 400. At the same time, we also

 21
recognize that a determination of what is detrimental to the public may, at times, necessarily

require some inquiry into how the transfer of assets might eliminate benefits that would

otherwise be available. In a case, as here, where the benefit alleged to be lost would be the

provision of adequate service at lower rates for customers, it is proper for the Commission to

consider the evidence that tends to establish that benefits that were available and likely to be

realized were lost. However, the lens of such inquiry is not one that examines which of two

competing proposals provides the most benefit.14 Rather, it is appropriate to consider how the

foreclosure of one opportunity may be said to make the applicant’s proposal result in a net

detriment. That is, the focus remains on the proposed sale being considered by the Commission.

Even then, the foreclosure of an alternative opportunity is merely one factor considered by the

Commission in determining whether, after balancing all appropriate factors, the transfer of assets

results in a net detriment to the public interest. We find that the Commission applied the

appropriate standard in analyzing Appellants’ evidence in light of its impact on Osage Utility’s

application, rather than as an independent, competing application to be weighed against Osage

Utility’s application as to which provides the greatest benefit.

 In arguing that the Commission arbitrarily disregarded the Joint Bidders’ proposal,

Appellants point to the Commission’s finding that “Staff did not do in-depth cost studies or

review in-depth the Joint Bidders’ proposal.” Appellants argue that this finding establishes that

the Commission arbitrarily failed to consider a relevant issue. However, the record reveals that

the Commission did analyze the Joint Bidders’ proposal, it simply did not conduct the same in-

14
 Of course, in a case in which the Commission has competing applications on file before it, the inquiry may
necessarily require the Commission to determine which application provides the most benefits as part of its
balancing process. In this matter, the Commission had only the application of Osage Utility before it.

 22
depth review that it conducted for the applicant (Osage Utility). At the hearing, in response to

questions by the Commission about the adequacy of the proposals and the level of analysis

provided to each, a Staff witness testified:

 Q. So if the Commission is looking at two different proposals, would Staff be able
 to tell us at this point even preliminarily which one is better than the other or if one
 solves the problem and the other doesn’t or is Staff not able to give us that
 information?

 A. I think that the proposal provided by the applicant [Osage Utility] is a complete
 preliminary proposal with cost estimate. I don’t think what’s been proposed other
 than that is a complete proposal or a complete cost estimate.

 ….

 Q. So you haven’t really analyzed either proposal?

 A. I did look – I did analyze the proposals. I did look at the proposals.

 Q. But neither proposal is fleshed out enough for you to tell us whether it would
 result in safe and adequate service?

 A. I think that the applicant [Osage Utility] has provided a proposal that is a good
 road map for safe and adequate service. I think there’s going to be some changes
 along the way.

 Moreover, the reasons a more thorough review was not conducted with regard to the Joint

Bidders’ proposal were not arbitrary, but related to the incompleteness of the Joint Bidders’

proposal and the fact that the Commission had only the application of Osage Utility before it. As

the Commission found: “Staff’s witness did not feel comfortable endorsing the Joint Bidders’

plan because it was too incomplete.” As the Commission found, LAWWA and MWA had not

evaluated the necessary improvements for three of its service areas and did not present any

estimates for the improvements. Likewise, they did not specify the source of their financing.

PWSD did not provide detailed cost estimates for a proposed interconnection between its current

service area and the Cedar Glen service area. The Commission also noted that the estimates

 23
provided by the Joint Bidders did not address system upgrades. The record reveals that the

Commission did consider the evidence presented by Appellants—it simply did not review it in-

depth as it would a complete application. The reason for this was its incompleteness. This is not

an arbitrary reason. After considering the evidence before it, the Commission concluded that

Osage Utility’s evidence was more persuasive, more credible, and more complete, and it

determined that the sale of assets to Osage Utility was not detrimental to the public interest. This

conclusion was not arbitrary.

 Appellants’ point two is denied.

 Public Counsel makes similar arguments in its point two, alleging that the Commission

arbitrarily ignored evidence regarding the disparity in the repair estimates and rate estimates

proposed by Osage Utility and the Joint Bidders. But again, as discussed above, any disparity

between the level of analysis provided to the two proposals was not arbitrary, but related to the

information that was missing from the Joint Bidders’ evidence. Moreover, not only did the

Commission consider the relevant evidence concerning the rate and repair estimates, the

Commission’s order specifically addressed such evidence. The Commission considered the

estimated rates of Osage Utility as compared to the Joint Bidders, and expressly found that

Osage Utility’s estimated rates,

 if approved during a rate case, would be a significant increase for Osage Water
 Company’s customers and would be substantially more than the rates proposed by
 the Joint Bidders. If all these estimates and proposed rates were to become reality,
 the higher rates charged by Osage Utility could be a financial detriment to Osage
 Water Company’s customers.

This language shows that, not only did the Commission consider the Joint Bidders’ rate

estimates, it considered the discrepancy between the estimated rates of Osage Utility and the

Joint Bidders to be a potential detriment to the transfer. Public Counsel, then, disagrees with the

 24
weight given to this factor.15 The Commission did not arbitrarily fail to consider the arguments

or evidence of Appellants or Public Counsel.

 With respect to the Joint Bidders’ repair estimates, the Commission noted that the Joint

Bidders’ evidence focused almost exclusively on the Cedar Glen service area; and even then, due

to the incompleteness of the estimates, “the Commission was not persuaded by the testimony of

Cedar Glen’s witness.” The Commission expressly found that “Osage Utility’s evidence was

more credible with regard to what repairs may be needed than that put forth by the parties

opposed to the transfer.” The record reveals that the Commission considered the relevant

evidence and factored it into its determination that the sale of the OWC assets to Osage Utility

was not detrimental to the public.

 Public Counsel’s point two is also denied.

 Point Three

 In their third point, Appellants contend that the Commission’s approval of the transfer

was unlawful, unreasonable, arbitrary, capricious, and not supported by competent and

substantial evidence. We begin by noting that this point is multifarious in that it asserts that the

Commission’s decision was error for multiple distinct reasons. Bowers v. Bowers, 543 S.W.3d

608, 615 (Mo. banc 2018). Thus, Appellants’ point three fails to comply with Rule 84.04(d) and

preserves nothing for review. Id. Nevertheless, we exercise our discretion to review this

defective point ex gratia to resolve this appeal on its merits. See id. In particular, Appellants

argue that the Commission (1) unlawfully shifted the burden to Appellants; (2) failed to

15
 The potential for increased rates for ratepayers does not require the Commission to disapprove of a transfer. See
AG Processing, Inc., 120 S.W.3d at 737. Rather, increased rates are “just one factor for the Commission to weigh
when deciding whether or not to approve” a transaction. Id.

 25
appropriately consider and weigh the detriments that would result from the transfer of the OWC

assets to Osage Utility; and (3) relied on factors irrelevant to the public interest.

 The parties agree that an applicant for the transfer of assets has the burden of showing

that the transfer is not detrimental to the public interest. Appellants argue that the Commission

improperly shifted the burden to the Joint Bidders when the Commission criticized the Joint

Bidders for not including detailed cost estimates and failing to have a plan which could have

been endorsed as a complete application. We disagree. Appellants argue both (1) that the

Commission failed to consider the Joint Bidders’ evidence, and (2) that the Commission

improperly shifted the burden to the Joint Bidders when the Commission did consider their

evidence. This argument is frivolous. In considering the Joint Bidders’ evidence, it was

necessary for the Commission to determine how persuasive it was and how much weight to

attribute to it, matters which required the Commission to evaluate it for what it was as well as

what it was not. The Commission did not improperly shift the burden to the Joint Bidders when

it evaluated their evidence.

 Although Appellants’ point three claims that the Commission’s decision was “[n]ot

[b]ased on [s]ubstantial and [c]ompetent evidence,” their analysis instead argues that the

Commission did not properly weigh the evidence. In their brief, Appellants posit: “The

Commission failed to appropriately weigh the detriments to the public interest in its analysis[.]”).

This fails to state our lens of review. Rather, we are to consider whether the Commission “could

have reasonably made its findings and reached its result, upon consideration of all the evidence

before it; and to set aside decisions clearly contrary to the overwhelming weight of the

evidence.” Wood, 197 S.W.2d at 649. In reviewing the evidence, we do not substitute our

judgment for that of the Commission. Wood, 197 S.W.2d at 649. This is particularly true for

 26
matters that fall within the Commission’s area of expertise. State ex rel. Sprint Missouri, Inc. v

Pub. Serv. Comm’n, 165 S.W.3d 160, 164 (Mo. banc 2005) (citing State ex rel. Mobile Home

Estates, Inc. v. Pub. Serv. Comm’n, 921 S.W.2d 5, 10 (Mo. App. W.D. 1996)).

 The Commission’s order is supported by competent and substantial evidence on the

record as a whole. We begin by noting that throughout their arguments in point three, Appellants

gather the evidence favorable to them, and, because they neglect the evidence that supported the

Commission’s order, provide an incomplete and inaccurate picture of the evidence in the record

as a whole. Appellants carry the burden of establishing that the Commission’s order was

unreasonable. Grain Belt Express Clean Line, LLC, 555 S.W.3d at 471. In the context of a

challenge to the competent and substantial evidence in the record on the whole, arguments that

neglect the evidence that supports the Commission’s decision cannot show that the decision is

contrary to the overwhelming weight of the evidence because such arguments provide an

incomplete portrayal of the evidence in the record as a whole.

 In any case, having considered the record as a whole, we conclude that the Commission’s

order is supported by competent and substantial evidence. The record reveals that there are

substantial benefits involved in a transfer of the assets to Osage Utility that, when weighed

against potential detriments, show that the Commission could reasonably find that the sale would

not be detrimental to the public. Osage Utility has the technical, managerial, and financial ability

to provide safe and adequate service to the OWC service areas. Osage Utility provided a

comprehensive plan for necessary improvements, which the Commission found reasonable.

Given the inadequate service that has been provided to some of the OWC areas, the Commission

gave particular weight to the stability that Osage Utility can provide to its customers after more

than fourteen years of instability. The Commission found significant Osage Utility’s affiliates’

 27
“proven track record of bringing distressed systems into compliance and operating them in a safe

and adequate manner.” The Commission also found benefit in the transfer taking place at the

end of the proceeding rather than being delayed further, and, in doing so, noted that the

Commission would have continued oversight of the systems. The record supports these findings.

 Appellants’ arguments focus on evidence that the Commission allegedly disregarded or

improperly weighed; however, the record reveals that the Commission did consider such

evidence, and we do not substitute our judgment for that of the Commission. Wood, 197 S.W.2d

at 649. Appellants argue that the transfer of the OWC assets to Osage Utility will result in

increased rates for ratepayers. However, as addressed in our analysis of point two supra, the

Commission factored this possibility into its analysis and even considered it as a detriment to

Osage Utility’s application. Appellants simply disagree with the weight the Commission gave to

this factor.

 The rates of customers depend in part on the utility’s expenditures in repairing and

maintaining the systems. In this matter, Osage Utility’s planned expenditures for the Cedar Glen

area were significantly higher than the planned expenditures proposed by PWSD, while LAWWA

and MWA did not provide estimates of its planned expenditures for the remaining OWC service

areas. If Osage Utility’s planned expenditures were unreasonable, then more weight should be

attributed to the Joint Bidders’ lower estimates in determining whether the transfer to Osage

Utility is detrimental to the public. Conversely, if the Joint Bidders’ planned repairs did not

address issues affecting the provision of safe and adequate service going forward, then less

weight should be attributed to the Joint Bidders’ lower rate and repair estimates. Here, the Joint

Bidders’ had not fully identified what repairs they would make nor had they provided complete

estimates of the cost of repairs that they did plan to make. The Joint Bidders’ plan also did not

 28
address system upgrades that could ensure that the systems would continue to provide safe and

adequate service and avoid more costly repairs in the future. These were considerations that

affected the Commission’s balancing process and the weight to be attributed to the Joint Bidders’

estimates.16 In particular, the Commission found that “Osage Utility’s evidence was more

credible with regard to what repairs may be needed than that put forth by the parties opposed to

the transfer.” We defer to the Commission on matters of credibility. Wood, 197 S.W.2d at 649.

We also do not substitute our judgment for that of the Commission on matters that fall within its

area of expertise, Sprint Missouri, Inc., 165 S.W.3d at 164, such as the reasonableness and

necessity of expenditures designed to provide safe and adequate service. We do not find the

Commission’s order to be unreasonable.

 Appellants argue that the transfer of the OWC assets to Osage Utility will result in the

unnecessary duplication of assets in that a second well would be required to service the Cedar

Glen area. But again, Appellants ignore the fact that the Commission fully considered this issue:

 The Joint Bidders also argue that the water customers at Cedar Glen Condominiums
 will benefit from the redundancy of a second well once the area becomes
 interconnected with PWSD#5’s facilities. The Joint Bidders claim that this will
 save customers the costs of the second well, again lowering rates over what Osage
 Utility will have to charge. Whether a second well is necessary was not
 conclusively proven. Further, even though PWSD#5’s current service territory is
 near the Cedar Glen Condominiums, it lies on the opposite side of U.S. Highway
 54. Thus, the evidence showed that it would likely be two years before this
 interconnection could be made given the need to acquire rights of way and permits
 to cross the highway. These costs were not taken into account in the cost estimates
 provided by PWSD#5.

16
 Additionally, Osage Utility agreed to adopt the OWC’s current rates for customers until after it filed a rate case
with the Commission. In a rate case, the Commission evaluates proposed changes in rates and approves a new rate
only if the Commission finds that rate to be just and reasonable. Also, maintenance expenditures are evaluated for
prudence in a rate case before such expenditures can affect customers’ rates.

 29
 In particular, the Commission found that Osage Utility’s evidence was not only more

comprehensive and more persuasive, but also more credible than Appellants’ evidence with

regard to what repairs may be needed. We defer to the Commission’s technical expertise and

credibility determination. Sprint Missouri, Inc, 165 S.W.3d at 164; Wood, 197 S.W.2d at 649.

 Appellants argue that the Commission failed to consider that Osage Utility was a private,

for-profit company rather than a public or non-profit entity. However, the Commission’s order

expressly recognized that one of the benefits of ownership by the Joint Bidders might be an

opportunity for greater customer participation due to the organizational structure of these entities.

Appellants argue that a further detriment involved in a transfer to Osage Utility is that Osage

Utility is non-local, whereas the Joint Bidders are local entities. However, the Commission

expressly considered the potential benefit of the Joint Bidders already having a presence in the

Lake of the Ozarks area. Appellants argue that the Commission failed to consider the public

comments of residents represented by Cedar Glen which expressed a preference that PWSD

provide service to their area. But again, the Commission expressly considered this preference in

its order. Although these considerations tend to show that there might be potential benefits to

the Joint Bidders’ ownership, the Commission factored these benefits into its balancing process.

We do not find the result of its process to be unreasonable or contrary to the overwhelming

weight of the evidence in the record as a whole.

 Appellants make further arguments that some of the benefits that the Commission

considered are irrelevant. Appellants contend that the Commission erred when it found benefit

in transferring the assets at the end of the current proceeding rather than further delaying the

transfer. Appellants also contend that the Commission erred when it found benefit in the

continued oversight by the Commission over the systems, whereas the Commission would have

 30
no jurisdiction over the Joint Bidders. Although generally the desire to avoid further proceedings

should not factor into the Commission’s decision, in dealing with facilities that require

immediate repairs and maintenance that affect the adequacy of service, further and unnecessary

delays to the provision of adequate service have at least some relevance to the public interest.

Additionally, although Appellants are correct that the Commission should not express a

preference for regulated entities over non-regulated entities, we again note that the systems at

issue had numerous compliance issues and required immediate repairs. In light of these

circumstances, as well as the fact that the Commission found Osage Utility’s evidence was more

persuasive and credible with regard to what repairs were necessary, the Commission’s ability to

ensure that the appropriate repairs are made has some relevance to the issue of whether the sale

of assets to Osage Utility is detrimental to the public.

 After considering the evidence in the record as a whole, we find that the Commission

could reasonably determine that the sale of the OWC assets to Osage Utility was not detrimental

to the public. Based on the record before us, the Commission’s order was supported by

competent and substantial evidence and was not contrary to the overwhelming weight of the

evidence on the record as a whole.

 Appellants’ point three is denied.

 Point Four

 In their fourth point, Appellants argue that the Commission erred in granting a CCN to

Osage Utility, because Osage Utility’s proposal does not promote the public interest as is

required for the issuance of a CCN pursuant to section 393.170.

 In deciding whether to grant a CCN, the Commission determines whether the proposed

operation of a water or sewer corporation is necessary or convenient for the public service. §

 31
393.170. In this matter, the Commission applied what have become known as the “Tartan

Energy Criteria” in making this determination. See In re Tartan Energy Co., GA-94-127, 1994

WL 762882 (Mo. P.S.C. Sept. 16, 1994). The criteria are: (1) the need for the service; (2) the

applicant’s qualifications; (3) the applicant’s financial ability; (4) the economic feasibility of the

proposal; and (5) promotion of the public interest. Id.

 The entirety of Appellants’ argument on this point is contained in two paragraphs. The

argument reiterates by reference the arguments Appellants made in point three and is premised

on the conclusion that, because Osage Utility’s proposal is detrimental to the public interest, it

cannot possibly promote the public interest. For the same reasons stated in denying point three

(that the Commission did not err in determining that the transfer of assets to Osage Utility was

not detrimental to the public interest), we also find Appellants’ arguments in their point four

unpersuasive.

 Appellants’ point four is denied.

 Conclusion

 The decision of the Commission is affirmed.

 /s/Thomas N. Chapman
 Thomas N. Chapman, Judge

All concur.

 32